On respondent's petition for reconsideration filed July 30, and appellant's response to petition for reconsideration filed August 5, reconsideration allowed; former opinion (221 Or App 12, 188 P3d 410) clarified and adhered to as clarified October 15, 2008

## STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

## PAUL KENNETH SHIRLEY,
aka Paul K. Shirley,
*Defendant-Appellant.*

Multnomah County Circuit Court
051237398; A132681

195 P3d 457

Hardy Myers, Attorney General, Mary H. Williams, Solicitor General, and Anna M. Joyce, Assistant Attorney General, for petition.

Bronson D. James, Chief Deputy Public Defender, for response.

Before Edmonds, Presiding Judge, and Sercombe, Judge, and Riggs, Senior Judge.

EDMONDS, P. J.

**EDMONDS, P. J.**

◼        The state petitions for reconsideration of our holding that the police officers in this case were required to advise defendant of his *Miranda* rights under Article I, section 12, of the Oregon Constitution before questioning him further because of the compelling circumstances that existed at the time. *State v. Shirley*, 221 Or App 12, 188 P3d 410 (2008). In the state's view, our reasoning is inconsistent with the Supreme Court's decision in *State v. Shaff*, 343 Or 639, 175 P3d 454 (2007). We allow reconsideration and adhere to our former opinion as clarified.

        We recite the pertinent facts from our original opinion:

    "In late December 2005, around 4:20 p.m., City of Portland Police Officer Hendrie was conducting a 'plain clothes mission' near the Portland bus mall, for the purpose of 'spotting drug transactions between dealers and smokers of crack cocaine.' He saw what he believed was a drug transaction occur between another person and defendant, during which defendant purchased controlled substances. Hendrie approached defendant, who was walking away from him, and showed defendant his badge, identifying himself as a police officer. Hendrie was not wearing a uniform, and he did not have his weapon drawn. When Hendrie identified himself as a police officer, he saw defendant swallow 'very hard.' Based on his training and experience, Hendrie believed that defendant was trying to dispose of the controlled substance that he had just purchased. Hendrie told defendant to 'spit it out.' Defendant said, 'I don't have anything,' and Hendrie replied, 'I watched you just purchase drugs. Spit it out.' Defendant then opened his mouth, displaying a piece of hard candy. Hendrie told defendant that he still believed that he had swallowed the drugs.

    "At that point, Officer Simon arrived on the scene, and Hendrie informed Simon that defendant was denying that he had just purchased a controlled substance. Hendrie then observed a rock of crack cocaine packaged in plastic on the sidewalk 'almost directly beneath where [defendant's] right side would be.' Hendrie picked up the cocaine, handed it to Simon, and told defendant, 'Well, it doesn't matter. We found your drugs.' Hendrie then told defendant that it was 'not a big deal,' that he did not need to start lying, and that

'it's disrespectful for him to lie.' Defendant responded, 'Okay, yeah, I bought it for $10.'

"Defendant was not handcuffed or physically restrained by the officers at the time that he made the statement that he had purchased the cocaine for $10. Hendrie told the other officer to leave because defendant 'was being cooperative.' Defendant was then issued a citation and permitted to leave the scene. Hendrie characterized the interaction with defendant as 'low-key[,]' and the entire contact lasted 'approximately a minute.' "

Relying on *Shaff*, the state argues that, before compelling circumstances can be held to exist under Article I, section 12, *i.e.*, circumstances that are tantamount to an arrest, an officer must use incriminating evidence in a coercive manner. Here, the state argues,

"the detention was 'low key' and quite brief, approximately a minute. The encounter occurred in the middle of the day on a public street and was otherwise unaccompanied by threats, weapons, or force, and the officer's conduct was not overbearing in a manner that might pose questions as to voluntariness."

In *Shaff*, a pizza delivery driver called the police because he was concerned that the woman who answered the door to receive the pizza that he was delivering appeared injured. Pursuant to that report, the police went to what turned out to be the defendant's residence. During the subsequent inquiry, one officer went to check on the woman's welfare while another officer engaged the defendant in general conversation. The officer asked the defendant whether the defendant and the woman had argued that night. The defendant replied, "[We] always argue." The officer asked next whether the argument had become physical, and the defendant replied that it had not. The officer and the defendant continued to have a general conversation that included other topics, and, at one point in time, the defendant left the officer's presence and went into the kitchen of the residence to obtain a cigarette.

About 10 minutes later, the other officer reported to the officer conversing with the defendant that the woman had injuries that were consistent with an assault and took

the woman outside of the residence. The officer again asked the defendant whether the argument had become physical, observing that the woman "obviously [had] been assaulted." The officer also asked the defendant "if he knew why she would say now that she had been assaulted." The defendant did not respond. The officer continued, telling defendant that "[he] understood and asked him what it was that she had done to anger him." The defendant responded, "[W]e were fighting about me looking at women on TV with big boobs. It's like this every night and it pisses me off. I get so mad that when I start hitting her I can't stop."

Based on the above facts, the *Shaff* court observed that "what matters is not whether evidence of guilt was apparent to the suspect; rather, it is whether the officers used that evidence in a coercive manner." 343 Or at 650. Accordingly, it reasoned,

> "The officer's questions were not coercive, aggressive, or repetitive. Indeed, the last question that the officer asked was sympathetic. Given the location of the encounter, the brief time that it lasted, and the absence of any 'heightened level of activity' by the officers, evidence that an assault had occurred (whether apparent to defendant or reflected in the officer's questions) is not sufficient to say that the officers had placed defendant in compelling circumstances that required *Miranda* warnings under the Oregon Constitution."

*Id.*

Whether compelling circumstances exist for purposes of Article I, section 12, necessarily depends on the particular circumstances of each case. *State v. Roble-Baker,* 340 Or 631, 641, 136 P3d 22 (2006). In this case, and in contrast to the facts in *Shaff*, Officer Hendrie's initial contact with defendant was both aggressive and coercive in nature. After showing defendant his police badge and observing defendant apparently attempt to swallow an object, Hendrie commanded defendant to "spit it out." When defendant protested that he had nothing in his mouth, Hendrie again told him to "[s]pit it out." Despite the fact that defendant revealed a piece of hard candy in his mouth to the officer, the officer told defendant that he did not believe defendant's claim that he

was not in possession of an illegal drug. When the officer discovered the rock of cocaine near defendant's feet, he told defendant, "Well, it doesn't matter. We found your drugs." Then the officer told defendant that it was "not a big deal," that defendant should not lie to him, and that "it's disrespectful * * * to lie."

Whether questions are "coercive" in nature depends on whether they compel a person to undertake "an act or choice by force, threat, or other pressure" that the person would not otherwise make. *Webster's Third New Int'l Dictionary* 439 (unabridged ed 2002). The commands made to defendant by Hendrie pursuant to a manifestation of his authority to spit out what was in his mouth are inherently coercive and are significantly different in tenor from the general conversation that preceded the questions about incriminating evidence in *Shaff*. Also, Hendrie told defendant that he did not believe defendant's protestation of innocence—unlike the officer in *Shaff* who took a more sympathetic approach to the defendant. Additionally, there is no evidence in this case that the coercive atmosphere created by the officer's initial commands had dissipated before the officer discovered the cocaine rock at defendant's feet. Thereafter, the questions from Hendrie continued in the same coercive vein—the officer dominated the encounter and asserted his authority as a police officer, admonishing defendant not to lie to him, because defendant's denial that he possessed the cocaine constituted disrespect to the officer.

As we concluded in our original opinion, in light of what had previously occurred, the discovery of the cocaine would have indicated to a reasonable person in defendant's circumstances that he was in *de facto* custody as soon as the cocaine was discovered. The officer had already informed defendant that he believed that an illegal drug transaction had occurred, and his questions were part of his investigation to discover incriminating evidence to support his conclusion about that transaction. It is also clear from the record that the pressure created by the officer's follow-up questions constituted "an effort by the officer to extract an incriminating statement from defendant about his possession of the cocaine" after defendant was constructively under arrest. 221 Or App at 17. Accordingly, Article I, section 12, required the

officer to give *Miranda* warnings before seeking to obtain such a statement, and, for the above reasons, the holding in *Shaff* does not require a different result.

Reconsideration allowed; former opinion clarified and adhered to as clarified.