Submitted on remand from the Oregon Supreme Court March 22, reversed and remanded September 21, 2011

**STATE OF OREGON,**
*Plaintiff-Respondent,*

*v.*

**FRANK JOSEPH ZACCONE,**
aka Frank Joseph Zaccone Jr.,
*Defendant-Appellant.*

Multnomah County Circuit Court
060935633; A136329

261 P3d 1287

Peter Gartlan, Chief Defender, and Laura A. Frikert, Deputy Public Defender, Office of Public Defense Services, for appellant.

John R. Kroger, Attorney General, Mary H. Williams, Solicitor General, and Tiffany Keast, Assistant Attorney General, for respondent.

Before Haselton, Presiding Judge, and Brewer, Chief Judge, and Armstrong, Judge.

ARMSTRONG, J.

**ARMSTRONG, J.**

This case is on remand from the Oregon Supreme Court, which vacated our previous decision in *State v. Zaccone*, 234 Or App 267, 227 P3d 215 (2010) (*Zaccone I*), and remanded for reconsideration in light of *State v. Ashbaugh*, 349 Or 297, 244 P3d 360 (2010). *State v. Zaccone*, 349 Or 663, 249 P3d 1281 (2011) (*Zaccone II*). In *Zaccone I*, defendant argued that the trial court had erred in denying his motion to suppress evidence discovered during searches of defendant's backpack and fanny pack, which were found in the back seat of the car in which defendant was a passenger. We agreed with defendant, concluding—under the then-appropriate inquiry established by the Supreme Court in *State v. Holmes*, 311 Or 400, 409-10, 813 P2d 28 (1991), concerning whether a defendant had been seized for purposes of Article I, section 9, of the Oregon Constitution—that the objective component of a *Holmes* type (b) stop,[1] *viz.*, whether a reasonable person in defendant's position could have believed that his or her liberty or freedom of movement had been significantly restricted by a law enforcement officer, was satisfied. However, because the trial court had not addressed the subjective component of such a stop, we remanded the case to the trial court to do that, instructing the court to suppress the evidence if it concluded that defendant "subjectively believed that he was not free to leave when he was asked for consent to search." *Zaccone I*, 234 Or App at 274. The only issue before us on remand is whether, under the inquiry articulated by the Supreme Court in *Ashbaugh*, defendant was seized for purposes of Article I, section 9. As the following discussion explains, we conclude that defendant was seized for purposes of Article I, section 9, and, hence, that the trial court erred in denying defendant's suppression motion.[2]

---

[1] In *Holmes*, the Supreme Court held that a seizure occurs "(a) if a law enforcement officer intentionally and significantly restricts, interferes with, or otherwise deprives an individual of that individual's liberty or freedom of movement; or (b) whenever an individual believes that (a), above, has occurred and such belief is objectively reasonable in the circumstances." 311 Or at 409-10.

[2] The state does not contend that, if we conclude that defendant was seized, we can nonetheless affirm the suppression ruling because the officers acted with reasonable suspicion or defendant's consent to search the backpack or fanny pack was the attenuated product of an unlawful seizure.

We recite the material facts as set forth in *Zaccone I.*

"Defendant was a passenger in a car that was stopped for a traffic violation. Officer Rilling, who conducted the traffic stop, asked the driver, defendant, and another passenger for their identification. The front-seat passenger provided Rilling with her identification. Defendant, who was seated in the back seat, told Rilling that he did not have any identification, because he was just going to the store to buy cigarettes and did not think that he needed it. Rilling then asked defendant if he 'minded giving [her] his name.' Although barely audible, defendant gave a name that sounded to Rilling like 'Andy.' When Rilling then asked, 'Andy, what is your last name,' defendant corrected her, saying, 'It's Anthony,' and reported that his last name was '[u]h, Brady.' At some point, Rilling also asked defendant for his date of birth; she testified that he had a hard time recalling his birthday. Because of his demeanor and hesitancy in providing the information, Rilling believed that defendant was probably giving her a false name. The entire encounter with the car's occupants, up to that point, lasted '[m]aybe a minute.'

"Rilling then returned to her patrol car to run warrant checks on the car's occupants. She did not tell them that that was what she was doing, nor were they able to see or hear her conducting the check. The warrant check revealed that the driver had a suspended license; consequently, Rilling decided to impound the car. No records matched the name that defendant had given her, which Rilling testified, 'usually means * * * either they've given me a wrong name, I've typed it down—I've put it in the computer wrong, I've copied [it] down into my notebook wrong.'

"Rilling radioed for a cover officer and Officer Reynaga responded. Rilling told Reynaga that she was about to tow the car because the driver had a suspended license; she also told him that she believed defendant had given her a false name. When Reynaga walked up to the car, he could see that defendant was trying to hide something with his feet. He asked defendant to step out of the car, because the car was being towed. After defendant got out of the car, Reynaga saw that defendant had been trying to hide a wallet underneath the front seat. Reynaga asked defendant if the wallet contained defendant's identification and if Reynaga could get it and look at it. Defendant agreed and

told Reynaga that he had initially given Rilling a false name because he thought that he had an outstanding warrant for his arrest.

"Rilling then ran a warrant check using defendant's correct identification. The check revealed that there were no outstanding warrants for defendant's arrest but that he was on probation for identity theft. Rilling approached defendant, told him that she knew that he was on probation, and asked him why he thought that he had an outstanding warrant. He replied that it was because he had failed to check in with his probation officer. Rilling informed defendant that he did not have any outstanding warrants, but asked him to 'please stand at the front of Officer Reynaga's patrol vehicle.' She also directed the driver and the front-seat passenger to step out of the car and stand by Reynaga's car. She testified that she did that so that she could safely inventory the car before towing it. Rilling testified that defendant and the other passenger were free to leave at that point and that she would have told them as much 'if they would've asked, but they didn't ask.' She also indicated, however, that if they had just walked away without asking, she 'may have questioned why they were walking away.'

"During the inventory of the car, Rilling found a backpack and a fanny pack on the back seat of it. The driver indicated that the items belonged to defendant. After asking him twice, Rilling obtained defendant's consent to search the backpack. In it, she found a wooden box containing burglary tools and a blue paper folder containing personal information belonging to different people. She then requested and obtained defendant's consent to search the fanny pack. She discovered a wallet, which contained an identification card for an 'Anthony Brady,' the name that defendant had initially given her. There was also a day planner, which had more addresses, names, Social Security numbers, and account numbers written in it. Rilling also found a glass methamphetamine pipe and a baggie containing a small amount of methamphetamine inside a red bandana. At that point, she took defendant into custody."

*Zaccone I*, 234 Or App at 269-71 (alterations in original; footnote omitted).

In light of those facts, we concluded in *Zaccone I* that "a reasonable person in defendant's position *could* have

believed that his freedom of movement was significantly restricted when he was asked to go stand in front of Reynaga's patrol car and then asked for consent to search." *Id.* at 274 (emphasis added). However, in *Ashbaugh,* the Supreme Court modified the objective component and abandoned the subjective component of the *Holmes* test, substituting the following test:

> "A 'seizure' of a person occurs under Article I, section 9, of the Oregon Constitution: (a) if a law enforcement officer intentionally and significantly restricts, interferes with, or otherwise deprives an individual of that individual's liberty or freedom of movement; or (b) if a reasonable person under the totality of the circumstances *would* believe that (a) above has occurred."

*Ashbaugh,* 349 Or at 316 (emphasis in original).

Under that test, the lodestar for determining whether an officer has seized a defendant under Article I, section 9, is whether the officer restricted the defendant's liberty or freedom of movement by a show of authority, *State v. Rodgers/Kirkeby,* 347 Or 610, 621-22, 227 P3d 695 (2010), which may be established through, among other circumstances, the content of the officer's questions to the defendant or the officer's manner or actions during the encounter, *State v. Levias,* 242 Or App 264, 266-67, 255 P3d 611 (2011). Moreover, a reasonable person would believe that an officer's actions amounted to such a show of authority "if the person knew that he or she was the subject of a criminal investigation." *State v. Radtke,* 242 Or App 234, 239, 255 P3d 543 (2011).

In *Ashbaugh,* two police officers approached the defendant and her husband in a public park, took their identifications, and ran a warrant check on both of them. The warrant check revealed an active restraining order between the defendant and her husband, which led the officers to arrest the husband for violating the order. Then, after returning the defendant's identification to her and leaving her alone for about five minutes to place her husband in a police car, the officers returned to the defendant's location and, eventually, asked her for consent to search her purse. An officer discovered methamphetamine in the purse.

In determining whether the defendant had been seized, the Supreme Court reasoned that

> "the officers had returned defendant's identification to her and left her alone while completing the arrest and transportation of her husband. Thus, while it may have been true that defendant had been unlawfully detained by police some minutes before and had watched a clear show of authority directed at her husband, those circumstances had ended."

*Ashbaugh*, 349 Or at 317. Therefore, based on the totality of the circumstances at the time that the officers asked the defendant for consent to search her purse, the court concluded that a reasonable person would not have believed that his or her liberty or freedom of movement had been intentionally and significantly restricted and, accordingly, that the defendant had not been seized. *Id.* at 317-18.

Here, as the Supreme Court instructed in *Ashbaugh*, to resolve whether defendant was seized for purposes of Article I, section 9, we consider the totality of the circumstances at the time that Rilling asked defendant for consent to search defendant's backpack and fanny pack. Although at that point of the encounter Rilling had informed defendant that he did not have any outstanding warrants,[3] Rilling had told defendant that she knew that he was on probation for identity theft, and defendant had admitted to Reynaga that he had given Rilling a false name at the beginning of the

---

[3] That fact differentiates this case from our recent decisions applying the test outlined in *Ashbaugh* in which we concluded that a reasonable person would believe that his or her freedom of movement had been restricted when, most importantly among other circumstances presented in each decision, an officer requests a person's identification and runs a warrant check without outwardly restraining the person in any other way. *E.g.*, *Radtke*, 242 Or App at 241 ("We conclude that a reasonable person in defendant's position would have believed that an investigation began when [the officer] took note of her name and date of birth; thus, * * * she was under the impression that the police had begun an investigation of her and *had not given her any reason to believe that it had ended.* * * * [T]hose facts add up to a seizure." (Emphasis added.)); *State v. Parker*, 242 Or App 387, 394, 255 P3d 624 (2011) (concluding that a reasonable person would believe that he or she was not free to leave when the officer "wrote down defendant's name and date of birth" and "then immediately returned to his vehicle and ran a [warrant] check"). Unlike those cases, the warrant check in this case ended when Rilling told defendant that he had no outstanding warrants, and, therefore, the warrant check plays no more than a contextual role in our analysis.

encounter. After defendant had told Rilling that he was concerned that he had an outstanding warrant for failing to check in with his probation officer, Rilling did not tell defendant that, in light of the result of the warrant check, he was free to leave despite his concern, but, rather, Rilling directed defendant to stand at the front of Reynaga's patrol car.

A reasonable inference from that sequence of events is that defendant was the subject of a continuing investigation, and, hence, a reasonable person in the circumstances presented in this case would believe that his or her freedom of movement had been significantly restricted by Rilling's show of authority. Therefore, under the test articulated in *Ashbaugh*, defendant was seized for purposes of Article I, section 9, and, accordingly, the trial court erred in denying defendant's motion to suppress.

Reversed and remanded.