Argued and submitted February 19, affirmed July 2, petition for review denied October 23, 2014 (356 Or 400)

### STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

### JOEL RICARDO ACUNA,
*Defendant-Appellant.*

Washington County Circuit Court
C112583CR; A151812

331 P3d 1040

Sarah Laidlaw, Deputy Public Defender, argued the cause for appellant. With her on the briefs was Peter Gartlan, Chief Defender, Office of Public Defense Services.

Pamela J. Walsh, Senior Assistant Attorney General, argued the cause for respondent. With her on the brief were Ellen F. Rosenblum, Attorney General, and Anna M. Joyce, Solicitor General.

Before Ortega, Presiding Judge, and DeVore, Judge, and Garrett, Judge.*

GARRETT, J.

--------------

* Garrett, J., *vice* Edmonds, S. J.

## GARRETT, J.

Defendant was convicted of one count of unlawful delivery of marijuana for consideration, ORS 475.860(2). On appeal, defendant assigns error to the trial court's denial of his motion to suppress evidence. We affirm.

The events at issue occurred on November 28, 2011. At 4:41 p.m., Hillsboro police received a telephone call from an anonymous informant, who reported that four males in their late teens or early twenties were smoking marijuana while standing at the intersection of Southeast 16th Avenue and Southeast Oak Street. The informant described two vehicles that were associated with the young men: a white extended-cab Ford pickup truck and a beige sport utility vehicle.

At 5:10 p.m., approximately one-half hour after the informant's call, Officer Ploghoft arrived at the intersection in a marked patrol vehicle. The vehicle's lights and sirens were not activated. Ploghoft saw two vehicles that matched the informant's description and three men, including defendant, standing on the sidewalk next to the vehicles, with a dog on a leash. Ploghoft approached the men on foot and greeted them from a distance of about five to eight feet. He explained that police had received a report of marijuana use at that location and asked the men if they had been using marijuana. Defendant and his companions denied smoking or possessing drugs.

Within the first minute of the conversation, Ploghoft noticed a strong smell of what he believed was unburned marijuana in the immediate vicinity. Ploghoft could not pinpoint the odor's source. He asked the men about the odor and again asked whether they had marijuana, which they continued to deny.

At 5:12 p.m., Ploghoft radioed for a backup officer. While waiting for assistance, Ploghoft explained to the men that he "appreciate[d] honesty and cooperation from them" and that "simple possession of less than an ounce of marijuana *** is simply a ticket or violation." Defendant

said that he "needed to go, because his girl was calling him." Ploghoft did not respond, and defendant did not try to leave.[1]

Shortly thereafter, Officer Peterson arrived on the scene. Peterson, according to Ploghoft's testimony, was "more aggressive" than Ploghoft. Ploghoft asked defendant for consent to a patdown search. In reply, defendant handed Ploghoft a glass pipe from his pocket. Ploghoft observed that the pipe contained burnt marijuana residue and smelled of burnt marijuana. Defendant then consented to the patdown search. During the search, Ploghoft felt a baggie "with something soft in it" in defendant's pants pocket. He asked defendant if he had "weed" in his pocket, and defendant replied that he did. Ploghoft then asked for, and received, consent to remove the baggie. It contained marijuana.

While Ploghoft was searching defendant, Peterson approached the truck and smelled marijuana coming from a backpack, which defendant eventually admitted was his. Ploghoft asked for consent to search defendant's backpack. When defendant showed reluctance to permit the search, Ploghoft explained to defendant that he had "the option to give [the officers] permission to search his backpack" and that "another option would be for [the officers] to seize the backpack and either write or apply for a search warrant." Defendant gave consent to search the backpack, and a third officer stood with defendant and his companions during the search of the backpack. In the backpack, police found a large glass jar containing marijuana that Ploghoft believed to be "a quantity greater than just user amount," approximately 20 plastic baggies with marijuana residue in them, a digital scale with what appeared to be marijuana residue, and a small, wooden baseball bat.

Defendant was placed in handcuffs at 5:32 p.m., about 22 minutes after the encounter began. At 5:52 p.m., Ploghoft read defendant his *Miranda* rights. Ploghoft then

---

[1] Ploghoft testified that when defendant said that he "needed to go," Ploghoft did not consider defendant free to leave; however, Ploghoft did not indicate that to defendant.

transported defendant to the Washington County Jail; while in transit, Ploghoft requested consent to search defendant's cell phone, which defendant refused. After defendant was in custody at the jail and while defendant's phone was being logged into evidence, Peterson viewed some of the text messages on the phone. Ploghoft separately applied for and received a search warrant to view messages on the phone, but he did not use any information obtained from Peterson's review of the phone in his warrant application.

Defendant was charged with one count of unlawful delivery of marijuana for consideration, ORS 475.860(2). Before trial, defendant filed a motion to suppress evidence, arguing that he was unlawfully stopped and unlawfully searched; that police violated his rights against self-incrimination; and that the warrant to examine his cell phone was based on information derived from an illegal search. After a hearing, the trial court issued a letter opinion denying defendant's motion. The trial court ruled that Ploghoft had "reasonable ground[s]" to justify the stop, that defendant consented to the patdown search, that defendant's rights against self-incrimination were not violated, and that the warrant issued regarding the cell phone was valid. Reserving his right to appeal the trial court's ruling, defendant waived his right to a jury trial and tried his case to the court, which convicted him and sentenced him to 18 months' probation.

## DISCUSSION

On appeal, defendant assigns error to the trial court's denial of the motion to suppress. Relying on both the state and federal constitutions, defendant argues: (1) that he was illegally stopped because Ploghoft lacked probable cause or reasonable suspicion to believe that defendant possessed marijuana; (2) that the searches of defendant's person and backpack were illegal because they were the result of the illegal stop; (3) that his right against self-incrimination was violated when he was asked if he owned a backpack that smelled of marijuana; and (4) that the search warrant obtained to search his cell phone was invalid because it was based on unlawfully obtained information, specifically,

the drugs and other related items found in defendant's backpack.[2]

We review a court's denial of a motion to suppress for legal error. *State v. Tovar*, 256 Or App 1, 2, 299 P3d 580, *rev den*, 353 Or 868 (2013). We are bound by the trial court's findings of fact so long as there is constitutionally sufficient evidence in the record to support those findings. *State v. Ehly*, 317 Or 66, 75, 854 P2d 421 (1993).

We begin with defendant's argument that he was unlawfully stopped. This requires us to determine whether a stop occurred and, if so, when, and whether it was lawful under the circumstances at the time. The trial court concluded that defendant was stopped, but did not articulate precisely when, in its view, the stop occurred. On appeal, the parties agree that a stop occurred, but differ as to when it occurred. Defendant contends that he was stopped when Ploghoft initiated the encounter by asking him about drug possession, or, at the latest, when Ploghoft asked defendant for consent to the patdown search. The state's view is that defendant was not stopped until Ploghoft actually removed the baggie of marijuana from defendant's pocket.

Article I, section 9, provides in part: "No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search or seizure[.]" As the Supreme Court made clear in *State v. Ashbaugh*, 349 Or 297, 308, 244 P3d 360 (2010), some encounters between police and citizens fall in the category of "'mere conversation,' that is, noncoercive encounters that are not 'seizures' and, thus, require no justification under Article I, section 9." *See also State v. Backstrand*, 354 Or 392, 399, 313 P3d 1084 (2013), *State v. Fair*, 353 Or 588, 593-94, 302 P3d 417 (2013). Thus, "law enforcement officers remain free to approach persons on the street or in public places, seek their cooperation or assistance, request or

---

[2] We do not address defendant's federal constitutional claims. While defendant cited to state and federal constitutional provisions in his appellate brief, his analysis was based solely on state case law, and he did not raise any separate federal law arguments. We decline to consider claims supported by mere summary references to federal constitutional provisions. *State v. Amaya*, 336 Or 616, 634, 89 P3d 1163 (2004); *State v. McNeely*, 330 Or 457, 468, 8 P3d 212 (2000).

impart information, or question them without being called upon to articulate a certain level of suspicion in justification if a particular encounter proves fruitful." *State v. Anderson*, 354 Or 440, 450, 313 P3d 1113 (2013) (citing *State v. Holmes*, 311 Or 400, 410, 813 P2d 28 (1991)).

In contrast, a "stop" is a type of seizure "that involves a temporary restraint on a person's liberty and that violates Article I, section 9, unless justified by * * * reasonable suspicion that the person has been involved in criminal activity." *Ashbaugh*, 349 Or at 308-09. A stop occurs, "(a) if a law enforcement officer intentionally and significantly restricts, interferes with, or otherwise deprives an individual of that individual's liberty or freedom of movement; or (b) whenever an individual believes that (a), above, has occurred and such belief is objectively reasonable under the circumstances." *Ashbaugh*, 349 Or at 303 (internal quotation marks omitted). The Supreme Court explained in *Backstrand* that the distinction between a seizure and a "mere conversation" is "the imposition, either by physical force or through some 'show of authority,' of some restraint on the individual's liberty." 354 Or at 399 (citing *Ashbaugh*, 349 Or at 309) (internal citations and footnotes omitted). The court acknowledged that this distinction "does not lend itself to easy demarcation." *Id.* (citing *Fair*, 353 Or at 595).

Defendant argues that he was stopped when Ploghoft "asked defendant if he used or possessed marijuana." However, defendant's argument is less straightforward than it sounds, because the record indicates that Ploghoft engaged in this questioning for a period of several minutes, during which time he requested backup and was joined on the scene by Peterson. Additionally, the intensity of the questioning increased during the encounter.

To the extent that defendant argues that the stop occurred almost immediately—when Ploghoft approached the men on the sidewalk, said that police had received a report of marijuana use at that location, and asked them if they had marijuana—we reject defendant's argument. The facts upon which defendant relies are not sufficient to move the encounter from the realm of "mere conversation" to that of a seizure. The fact that Ploghoft arrived in a police

car and wore his uniform was not a "show of authority" for purposes of the seizure analysis. *Backstrand*, 354 Or at 402 (explaining that whether an individual, for personal reasons, feels compelled to cooperate with a police officer "simply because of the officer's status is not the form or source of coercion that is of constitutional concern"). In addition, the mere fact that Ploghoft asked defendant and his companions about drugs did not turn the encounter into a stop. *See Ashbaugh*, 349 Or at 317 (holding that an officer did not "seize" the defendant by asking whether she had anything illegal in her purse and for consent to search it). *State v. Moats*, 251 Or App 568, 575, 284 P3d 568 (2012) (holding that "questions from a police officer to a citizen—even questions an ordinary citizen would regard as offensive—do not, by themselves constitute a sufficient show of authority to effect a seizure"); *State v. Jones*, 241 Or App 597, 604, 250 P3d 452 (2011) (rejecting defendant's argument that, by virtue of asking defendant whether he possessed drugs or weapons, an officer was "implicitly accusing" him of criminal activity).

As the Supreme Court held in *Anderson*, an officer's verbal inquiry here is not enough—"something more is required." 354 Or at 450. The "something more" can be, for example, "the content or manner of questioning, or the accompanying physical acts by the officer, if those added factors would reasonably be construed as a 'threatening or coercive' show of authority requiring compliance with the officer's request." *Id.* (internal citations and quotations omitted). Verbal inquiries can amount to a restriction on a person's liberty if they convey to a reasonable person that he or she is the subject of a criminal investigation along with other circumstances that indicate a show of authority. *See State v. Levias*, 242 Or App 264, 267-68, 255 P3d 611 (2011) (holding that defendant was stopped when he was asked for consent to a patdown search, where one officer asked if defendant had engaged in illegal activity, the officer called for backup, a second officer questioned defendant about illegal activity, and when the request for consent was made, three patrol cars were on the scene with their lights activated). *See also State v. Zaccone*, 245 Or App 560, 563-67, 261 P3d 1287 (2011) (holding that defendant was seized

because "a reasonable inference * * * is that defendant was the subject of a continuing investigation, and, hence, a reasonable person * * * would believe that his or her freedom of movement had been significantly restricted by [the officer's] show of authority," where the officer told defendant that she knew that he was on probation, defendant admitted to the officer that he had given her a false name, and defendant was asked for consent to search a backpack).

In short, the initial encounter lacked a show of authority that would elevate it to the status of a stop.[3] But the record reflects that, as the encounter unfolded over several minutes, it took on the characteristics of a stop that it lacked at the outset, when Ploghoft began his questioning. First, the questions persisted even after defendant and his companions denied possessing drugs. Second, Ploghoft called for backup. Third, Peterson arrived on the scene, and there is evidence in the record that her questioning was "more aggressive" than Ploghoft's. Finally, Ploghoft asked defendant for permission to conduct a patdown search.

Those circumstances are sufficient to refute the state's contention that no stop occurred until Ploghoft actually *discovered* marijuana in defendant's pocket. A reasonable person in defendant's position would have perceived a show of authority, such that his liberty was significantly and intentionally restrained, at the time that Ploghoft asked to conduct a patdown search in the presence of a second officer. Although not every request for consent to a search will amount to a seizure, *see Ashbaugh*, 349 Or at 316-17, we view Ploghoft's request here in light of the attendant circumstances, particularly the facts that Ploghoft had announced that he was investigating a report of marijuana use, that he had requested backup, and that Peterson had just arrived on the scene and participated in "aggressive" questioning. Those circumstances make this case more

---

[3] In addition, although defendant relies on the fact that Ploghoft did not acknowledge defendant's statement that he needed to leave, defendant does not articulate how Ploghoft's silence, in and of itself, would have conveyed to a reasonable person that Ploghoft was exercising his authority to restrain the person. Under those circumstances, we do not view Ploghoft's silence in response to a single comment as rising to the level of a "show of authority."

like *Levias*, 242 Or App at 267-68. There, we viewed the facts that the first officer had called for backup and that the second officer arrived and joined in the questioning as important circumstances leading to the conclusion that the defendant was stopped when he was asked for consent to a patdown search.

Having determined that defendant was stopped, we next consider whether it was lawful. The state bears the burden of proving the facts that justify an exception to the warrant requirement. ORS 133.693(4); *State v. Lay*, 242 Or App 38, 43, 252 P3d 850 (2011). A stop must be supported by a reasonable suspicion of criminal activity. *State v. Hall*, 339 Or 7, 17, 115 P3d 908 (2005). Reasonable suspicion exists when (1) the officer subjectively believes that the person has committed or is about to commit a crime, and (2) that belief is objectively reasonable in light of the totality of the circumstances existing at the time of the stop. *State v. Maciel*, 254 Or App 530, 535, 295 P3d 145 (2013) (citing *State v. Belt*, 325 Or 6, 11, 932 P2d 1177 (1997)); *State v. Espinoza-Barragan*, 253 Or App 743, 747, 293 P3d 1072 (2012). To be objectively reasonable, the officer's suspicion must be based on specific and articulable facts. *Ehly*, 317 Or at 80. Reasonable suspicion "does not require that the facts as observed by the officer conclusively indicate illegal activity but, rather, only that those facts support the reasonable inference of illegal activity by that person." *State v. Dampier*, 244 Or App 547, 551, 260 P3d 730 (2011) (quoting *State v. Hiner*, 240 Or App 175, 181, 246 P3d 35 (2010)). An officer's reasonable suspicion must be "particularized to the individual based on the individual's own conduct." *State v. Miglavs*, 337 Or 1, 12, 90 P3d 607 (2004).

The state argues that the following circumstances establish that Ploghoft had reasonable suspicion that defendant had committed or was about to commit a crime: (1) the location had a reputation for being a site of illegal drug use; (2) the informant's tip was sufficiently reliable; and (3) Ploghoft smelled the odor of unburned marijuana in the immediate vicinity of defendant and his companions. Defendant contends that Ploghoft lacked reasonable suspicion because the informant's tip was uncorroborated

and because the odor of unburned marijuana could not be attributed to defendant.

As an initial matter, that defendant was present in an area known for drug activity is of little relevance; a person's presence in a high-crime area does not alone justify reasonable suspicion. "Mere presence in a high crime area * * * is insufficient to establish a reasonable suspicion of illegal activity." *Dampier*, 244 Or App at 552 (internal quotation marks omitted).

As to the informant's report, defendant cites *State v. Black*, 80 Or App 12, 721 P2d 842 (1986), and other cases for the rule that, where reasonable suspicion is based on an informant's report, we evaluate factors to determine the report's reliability, including whether the report was based on the informant's personal observations, and whether the officer's observations corroborate the information provided by the informant. Here, the informant related his or her own personal observations, and Ploghoft's observations corroborated the informant's report; Ploghoft saw the two vehicles described by the informant, saw a group of young men standing at the intersection (that the caller reported four men and Ploghoft found only three is not persuasive, as one could have departed in the half hour before Ploghoft arrived), and smelled the odor of unburned marijuana in the immediate vicinity.

That odor is an important factor in establishing reasonable suspicion in this case. *See, e.g., State v. Watson*, 353 Or 768, 784-85, 305 P3d 94 (2013) (holding that, after an officer's partner "smelled marijuana, [the officer] had the requisite reasonable suspicion of criminal activity that permitted him to investigate further"); *State v. Derrah*, 191 Or App 511, 518, 84 P3d 1084, *rev den*, 337 Or 84 (2004) (noting that the "scent of marijuana, emanating from a residence, without more, is sufficient to support" a finding of probable cause to search a residence for marijuana); *State v. Johnson*, 120 Or App 151, 157, 851 P2d 1160 (1993) (concluding that a detective had "reasonable suspicion that [the defendant] was either in possession of the drug, or had recently been in a place where it was manufactured" after detecting the drug's "distinct aroma").

Defendant argues that, because Ploghoft only detected the odor of marijuana in the vicinity of the men, and could not trace it to defendant in particular, that was inadequate to create a reasonable suspicion as to defendant. We disagree. Here, the odor gave Ploghoft a reasonable suspicion that one or more of the three men was involved in illegal drug activity that warranted further investigation, particularly in light of the informant's report. *See, e.g., Dampier*, 244 Or App at 549-50, 552; *State v. Bingman*, 162 Or App 615, 619-20, 986 P2d 676 (1999).

In short, we conclude that, under the circumstances, including the informant's report and Ploghoft's personal observations that corroborated that report, Ploghoft formed a reasonable suspicion that defendant was engaged in unlawful activity.[4] Accordingly, defendant was not illegally stopped. As a result of that conclusion, we need not consider defendant's arguments that the consensual searches of his person and his backpack were illegal, because those arguments depend entirely on defendant's premise that the stop was illegal. Defendant does not advance any argument for invalidating the searches other than his contention that they flowed from an illegal stop.

As a separate and independent basis for his argument that the motion to suppress should have been granted,

---

[4] Defendant argues that, because Ploghoft "could not articulate facts that indicated the quantity of marijuana he smelled was more than one ounce," and because possession of less than one ounce is only a violation, it follows that Ploghoft could have only "reasonably investigated for a violation," requiring the heightened standard of probable cause rather than reasonable suspicion. We reject that argument.

"[A]n officer does not need certainty or even probable cause, but only a reasonable suspicion, to support an investigation. The possibility that there may be a non-criminal explanation for the facts observed or that the officer's suspicion will turn out to be wrong does not defeat the reasonableness of the suspicion."

*State v. Kolendar*, 100 Or App 319, 323, 786 P2d 199 (1990). "[B]oth the legal and common definitions of 'contraband' indicate that the term encompasses anything that the law prohibits possessing. *** Marijuana falls within these definitions regardless of its quantity." *State v. Smalley*, 233 Or App 263, 271, 225 P3d 844 (2010). The fact that it was possible, during Ploghoft's investigation, that defendant possessed less than one ounce of marijuana—a *violation*—did not restrict Ploghoft from investigating whether defendant possessed more than one ounce—a *crime*. ORS 475.864(3). Ploghoft was not required to know the amount of marijuana that he suspected was present during his investigation of possession of *some quantity* of marijuana.

defendant contends that police violated his Article I, section 12, right against self-incrimination by interrogating defendant without reading him his *Miranda* rights.[5] We disagree.

To safeguard an individual's right against compelled self-incrimination, "before questioning, police must give *Miranda* warnings to a person who is in full custody or in circumstances that create a setting which judges would and officers should recognize to be compelling." *State v. Shaff*, 343 Or 639, 645, 175 P3d 454 (2007) (internal quotation marks omitted). An individual is in "full custody" when he or she is either (1) placed under formal arrest or (2) placed under restraints by police acting in their official capacity. *State v. Warner*, 181 Or App 622, 628, 47 P3d 497 (2002). To determine whether the circumstances were "compelling," factors that we consider include: (1) the location of the encounter; (2) the length of the encounter; (3) the amount of pressure exerted on the defendant; and (4) the defendant's ability to terminate the encounter. *Shaff*, 343 Or at 645. Those factors "are neither the exclusive factors" that we will consider, "nor are they to be applied mechanically." *State v. Roble-Baker*, 340 Or 631, 641, 136 P3d 22 (2006). Instead, we will consider "all the circumstances," and our "overarching inquiry is whether the officers created the sort of police-dominated atmosphere that *Miranda* warnings were intended to counteract." *Id*. In determining whether evidence of a defendant's guilt adds to compelling circumstances, "what matters is not whether evidence of guilt was apparent to the suspect; rather, it is whether the officers used that evidence in a coercive manner." *Shaff*, 343 Or at 650.

The inquiry into whether circumstances were compelling is "highly fact specific." *State v. Bush*, 203 Or App 605, 610, 126 P3d 705 (2006). We have also held that simply because a person is stopped, and not free to leave the scene of a detention, does not mean the attendant circumstances are compelling. *Id*. at 609 (holding that the fact that a person "who is subject to a stop is not free to go does not transform a stop into an arrest[,] *** nor does it mean that the detained person is in custody for purposes of the *Miranda*

---

[5] Article I, section 12, of the Oregon Constitution, provides, in part: "No person shall *** be compelled in any criminal prosecution to testify against himself."

rule"); *see also State v. Savage*, 208 Or App 472, 477-78, 144 P3d 1063 (2006). Questioning a suspect for a brief period of time, and even communicating to the suspect that an officer believes the suspect has committed a crime, does not give rise to "compelling" circumstances. *Shaff*, 343 Or at 647; *State v. Miller*, 146 Or App 303, 308-09, 932 P2d 112 (1997) (holding that *Miranda* warnings were not required where officer told defendant that he was under investigation for DUII and was not free to leave, then directed defendant to perform field sobriety tests).

In arguing that these circumstances were compelling, defendant relies principally on *State v. Shirley*, 223 Or App 45, 47, 195 P3d 457 (2008). In *Shirley*, a plain-clothes police officer observed what he believed to be a drug deal involving the defendant. The officer approached the defendant, identified himself as a police officer, and saw the defendant swallow "very hard." *Id.* The officer commanded the defendant to "spit it out." *Id.* When the defendant said he did not "have anything," the officer replied that he had "watched [the defendant] just purchase drugs" and again demanded that the defendant "[s]pit it out." *Id.* The defendant opened his mouth to show a piece of candy, to which the officer replied that he believed the defendant had swallowed drugs. *Id.* A second officer then arrived on the scene and was informed by the first officer that the defendant denied having purchased drugs. The first officer then saw a rock of crack cocaine packaged in plastic on the sidewalk "almost directly beneath where [the defendant's] right side would be." The first officer said to the defendant, "Well, it doesn't matter. We found your drugs," and informed the defendant that it was "disrespectful for him to lie." The defendant then stated, "Okay, yeah, I bought [drugs] for $10." *Id.* at 47-48. We concluded that those circumstances were "compelling" for purposes of Article I, section 12, because the first officer's "initial contact with defendant was both aggressive and coercive in nature," the officer's commands for the defendant to spit out what was in his mouth were "inherently coercive," and the circumstances were made more coercive by the officer's having "told defendant that he did not believe defendant's protestation of innocence." *Id.* at 49-50.

In this case, the encounter between Ploghoft and defendant began at 5:10 p.m. Defendant was arrested at 5:32 p.m. The encounter took place on a public sidewalk. The sirens and lights on the police cars were not activated. Force was never used or threatened. Unlike the officer in *Shirley*, Ploghoft never commanded defendant to do anything. Although Ploghoft may have become "stern" with the men at one point, there is no evidence of yelling or abusive conduct. Similarly, although Peterson arrived several minutes into the encounter and was more "aggressive," there is no evidence that her demeanor was inherently coercive.

In short, we conclude that defendant was not placed in compelling circumstances prior to his arrest at 5:32 p.m. Accordingly, we reject defendant's argument that Article I, section 12, requires the suppression of the evidence obtained during that time.[6]

Lastly, defendant challenges the warrant obtained to search his cell phone. Defendant argues that the supporting affidavit used information derived primarily from Ploghoft's search of the backpack, which defendant contends was unlawful because of the illegal stop and the *Miranda* violation. Because we conclude that the stop was lawful and that no *Miranda* violation occurred in this case, we reject defendant's argument regarding the search warrant.

For the foregoing reasons, we conclude that the trial court did not err in denying defendant's motion to suppress evidence.

Affirmed.

---

[6] Defendant does not argue that he was unlawfully interrogated during the approximately twenty minutes between his arrest at 5:32 p.m. and when he was read his *Miranda* rights. In any case, the record reflects that no interrogation occurred during that period.