Submitted January 26, 2016, affirmed June 21, petition for review allowed November 9, 2017 (362 Or 175)

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

CASSANDRA RENEE STEVENS,
*Defendant-Appellant.*

Douglas County Circuit Court
12CR1676FE, 12CR1963FE;
A156431 (Control), A156432

399 P3d 1053

Peter Gartlan, Chief Defender, and Brett Allin, Deputy Public Defender, Office of Public Defense Services, filed the brief for appellant.

Ellen F. Rosenblum, Attorney General, Paul L. Smith, Deputy Solicitor General, and David B. Thompson, Assistant Attorney General, filed the brief for respondent.

Before Ortega, Presiding Judge, and Lagesen, Judge, and Garrett, Judge.

## ORTEGA, P. J.

Defendant seeks reversal of her conviction for unlawful possession of methamphetamine, ORS 475.894, in Case No. A156431,[1] assigning error to the trial court's denial of her motion to suppress. She argues that a search of her backpack violated Article I, section 9, of the Oregon Constitution because her consent to the search was coerced.[2] In particular, she asserts that the requesting officer implied that defendant's parole officer was directing the search request and that she believed that failure to consent would subject her to sanctions for violating her parole. Alternatively, defendant argues that, even if her consent was voluntary, it was invalid because it was the product of illegal police conduct—specifically, that the police violated Article I, section 9, by seizing her without reasonable suspicion and then exploiting that illegal seizure to obtain her consent. The state counters that, in the totality of the circumstances, defendant's consent to the search was a "product of her free will." Moreover, the state argues that there was no illegal seizure of defendant because she was not seized at the time that she consented to the search. We agree with the state and affirm.

We review the trial court's denial of a motion to suppress for legal error and are bound by the trial court's factual findings if there is constitutionally sufficient evidence in the record to support them. *State v. Ehly,* 317 Or 66, 75, 854 P2d 421 (1993). If the trial court did not make express factual findings and there is evidence from which the trial court could have found a fact in more than one way, we presume that the trial court decided that fact consistently with its ultimate conclusion. *Id.*

One night, Officer Klopfenstein stopped a minivan on the side of a public highway for "having a headlight out." Four people were in the minivan—the driver, a male passenger in the front passenger seat, a male passenger

---

[1] This appeal is consolidated with Case No. A156432, which involves defendant's separate conviction for unlawful possession of methamphetamine. Defendant does not challenge that conviction on appeal.

[2] Article I, section 9, provides, in part: "No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure[.]"

in the rear passenger's side seat, and defendant, who was seated in the rear driver's side seat. The driver indicated to Klopfenstein that he had just met his passengers and was giving them a ride. During that conversation, Klopfenstein observed that the rear male passenger was acting "odd" and "increasingly intoxicated." Klopfenstein acquired the driver's "information" and returned to his patrol car where he "ran" that information. While the information was "still running," Klopfenstein returned to the minivan and asked the rear male passenger for identification. The passenger indicated that he did not have identification on him and told Klopfenstein that his name was "Jonathan Shaw." When Klopfenstein asked Shaw to spell his first name, he responded with various obviously incorrect spellings of Jonathan.

At that point, Klopfenstein turned his attention to defendant. He asked for her name and, after she gave it to him, she "volunteered that she was on parole." He then asked defendant if she knew the rear male passenger; she stated that she had known him for a couple of years and that "he's always told [me] his name was Jonathan Shaw."

Klopfenstein returned to his patrol car and "started running the people that I had learned about in the car as well, and they all came back with no wants or warrants and I * * * confirmed that [defendant] was on parole through dispatch." However, when Klopfenstein viewed a DMV photograph of "Jonathan Shaw," it was clear to him that the rear male passenger was not the man pictured in the photograph. At some point during this time, Officer Cordell arrived to provide backup, although there is no indication in the record that Cordell interacted with defendant.

Klopfenstein returned to the minivan and asked Shaw to step out, which he did. After Klopfenstein confronted him about the DMV photograph, Shaw admitted that his name was actually Jimmy Shaw and that he "was on supervision."[3] Klopfenstein confirmed that Shaw did not

---

[3] On cross-examination, Klopfenstein testified that defendant was the one who told him that Shaw's first name was actually Jimmy. The trial court did not make an explicit factual finding as to that issue, and ultimately, it was not necessary to the trial court's ultimate conclusion, nor is it necessary to our analysis on appeal.

have any "wants or warrants," and when he informed Shaw of that fact, Shaw "miraculously became sober." At some point during Klopfenstein's interaction with Shaw, Klopfenstein told defendant, "[Y]ou're on parole. If he has a warrant and you're telling me he's Jonathan and he's Jimmy there's going to be trouble for you * * * potentially through your PO."

After Klopfenstein learned that Shaw was not wanted, he stepped out of earshot of defendant and the other passengers and called defendant's parole officer, Cortes, to inform her "about this incident in general." Cortes told Klopfenstein that she had recently found a "backpack with pills in it" that she believed belonged to Shaw. However, she "couldn't prove it." She also indicated that defendant was with Shaw at the time that the pills were found and told Klopfenstein that "if [defendant] was with Shaw again that it was her opinion that she was using—likely using drugs again."

Klopfenstein returned to the minivan and immediately asked defendant, who was then standing next to the minivan, whether he could search the backpack that she was wearing. Defendant agreed that he could. She then "took it off her shoulder [and] set it on the ground in front of [Klopfenstein]." His search of the backpack revealed a glass methamphetamine pipe and methamphetamine residue. He informed defendant of her *Miranda* rights and, after some additional questions, arrested her.

Based on the evidence discovered during the search of her backpack, defendant was charged with unlawful possession of methamphetamine. Defendant moved to suppress the evidence, first arguing that Klopfenstein had stopped defendant in violation of Article I, section 9, without reasonable suspicion and had unlawfully extended a lawful traffic stop. Second, she asserted that her consent to search her backpack was coerced, in violation of Article I, section 9.

The trial court denied defendant's motion. On the evidence that was disputed, the court explicitly found that defendant had gotten out of the minivan on her own accord (not at Klopfenstein's request) and that Klopfenstein did not tell defendant that his request to search was coming from her parole officer, nor did he "say anything that would

lead her to that conclusion." Ultimately, the court convicted defendant after a stipulated evidence trial.

On appeal, defendant first argues that the search violated Article I, section 9, because her consent was coerced. In general, voluntary consent is a recognized exception to the rule that under Article I, section 9, warrantless searches are *per se* unreasonable. *State v. Bonilla*, 267 Or App 337, 341, 341 P3d 751 (2014), *aff'd*, 358 Or 475, 366 P3d 331 (2015). Whether the state has carried its burden to prove the voluntariness of consent requires us to "'examine the totality of the facts and circumstances to see whether the consent was given by defendant's free will or was the result of coercion, express or implied.'" *State v. Unger*, 356 Or 59, 72, 333 P3d 1009 (2014) (quoting *State v. Kennedy*, 290 Or 493, 502, 624 P2d 99 (1981)). Ultimately, whether consent is voluntary is a legal question. *State v. Stevens*, 311 Or 119, 135, 806 P2d 92 (1991). Relevant factors that we consider in making that determination include: "whether physical force was used or threatened"; "whether weapons were displayed"; "whether the consent was obtained in public"; "whether the person who g[ave] consent [was] the subject of an investigation"; "the number of officers present"; "whether the atmosphere surrounding the consent [was] antagonistic or oppressive"; and whether drug use impaired the defendant's "capacity to make a knowing, voluntary, and intelligent choice." *State v. Larson*, 141 Or App 186, 198, 917 P2d 519, *rev den*, 324 Or 229 (1996).

Defendant's argument is fairly narrow. She argues that Klopfenstein, through his contact with her parole officer, coerced her into consenting to the search. In particular, she asserts that Klopfenstein had implicitly conveyed to her that Cortes had requested or directed the search, thus leaving defendant with the choice of facing possible sanctions if she refused to consent to the search. Defendant points out that, early in the encounter, Klopfenstein had told her that there would be "trouble *** through her PO" unless she was truthful about Shaw's first name. She also argues that because Klopfenstein immediately asked for consent to search her backpack after he had contacted Cortes, she had reasonably believed that Cortes was directing the search

and that, because of the conditions of her parole, she would face sanctions if she refused to consent to the search.

We pause to discuss an important factual issue that was not explicitly resolved by the trial court. Defendant's argument assumes that, when Klopfenstein returned to the minivan after talking to Cortes, defendant knew at that point that Klopfenstein had talked to Cortes. From that fact, she argues that it was reasonable for her to believe that Cortes was directing the search. However, the record contains contradictory evidence on that factual issue, and the trial court did not explicitly resolve it. Because there is evidence in the record that would allow a finding that, at the moment defendant consented to the search, she did not know that Klopfenstein had contacted Cortes, we must presume that the trial court decided that fact in a manner consistent with the court's ultimate conclusion. Accordingly, we presume that the trial court found that Klopfenstein never communicated to defendant that he was going to contact, or that he had contacted, her parole officer before he asked her for consent to search.[4]

Nevertheless, even if defendant believed that Cortes was directing the search, that fact alone does not establish that defendant's consent was coerced. In cases involving requests to search by a probation officer, or in conjunction with a probation condition that required the probationer to submit to a search, we have held that mere "pressure" not to violate the conditions of probation is not alone sufficient to demonstrate coercion. *See State v. Davis*, 133 Or App 467, 475-76, 891 P2d 1373, *rev den*, 321 Or 429 (1995) (concluding that the defendant voluntarily consented to a search by his probation officer, when, "[o]ther than the pressure on defendant not to violate the terms of his probation, there was nothing coercive about the circumstances"). That is, the surrounding environment must be "so coercive as to preclude defendant from refusing to consent." *State v. Brock*, 254 Or App 273, 279, 295 P3d 89 (2012); *see also State v.*

---

[4] Ultimately, whether Klopfenstein had communicated to defendant that Cortes was directing the search is not particularly important to our resolution of defendant's consent argument. Nevertheless, we resolve that factual issue here because it is important to our analysis of defendant's second argument.

*Dunlap*, 215 Or App 46, 54, 168 P3d 295 (2007) ("In determining whether a probationer who was subject to a condition of probation that required him to submit to a search voluntarily consented to a search, we consider whether the probationer was effectively denied a reasonable opportunity to refuse the search or whether the environment was sufficiently coercive to preclude him from doing so."); *cf. State v. Guzman*, 164 Or App 90, 100, 990 P2d 370 (1999), *rev den*, 331 Or 191 (2000) (probation officer conveyed her intent to search the defendant's residence throughout the encounter and the defendant's "mere acquiescence" to that search was not voluntary consent).

Here, the surrounding circumstances were not so coercive as to preclude defendant from refusing to consent. Klopfenstein only admonished defendant that, if she was being untruthful about Shaw's identity, "there's going to be trouble for you *** potentially through your PO." Klopfenstein did not use or threaten physical force. He did not display any weapons. His manner was nonthreatening. There is no indication that defendant was impaired by drugs and, of the two officers present, only Klopfenstein engaged with defendant. Further, the entire interaction occurred on the side of a public road. Given that the surrounding circumstances were not coercive, defendant's parole status and Klopfenstein's comment that defendant needed to be truthful about Shaw's identity do not demonstrate that defendant's consent was the result of implied coercion. Accordingly, in the totality of the circumstances, the state proved that defendant's consent was voluntary.

We move to defendant's second argument, asserting that Klopfenstein unlawfully seized her in violation of Article I, section 9, by stopping her without reasonable suspicion of a crime. She asserts further that her consent was the product of that illegal stop and, therefore, that the trial court should have suppressed the results of the search. The state counters that Klopfenstein had not seized defendant at the time that he asked for consent to search her backpack.

Under Article I, section 9, a passenger in a lawfully stopped vehicle is not automatically seized by virtue of her status as a passenger. *State v. Ross*, 256 Or App 746, 750,

304 P3d 759 (2013). Instead, a passenger is seized when there "is the imposition, either by physical force or through some 'show of authority,' of some restraint on the individual's liberty." *State v. Ashbaugh*, 349 Or 297, 309, 244 P3d 360 (2010). The test is objective: "Would a reasonable person believe that a law enforcement officer intentionally and significantly restricted, interfered with, or otherwise deprived the individual of his or her liberty or freedom of movement." *State v. Backstrand*, 354 Or 392, 399, 313 P3d 1084 (2013). The inquiry is fact-specific and requires us to consider the totality of the circumstances involved. *Id.*

As the Supreme Court stated in *Backstrand*, "something more than just asking a question, requesting information, or seeking an individual's cooperation is required of an officer's conduct" to constitute a show of authority "that gives rise to a seizure in the constitutional sense." *Id.* at 401-03. "The 'something more' can be such things as the content or manner of questioning, or the accompanying physical acts by the officer, if those added factors would reasonably be construed as a 'threatening or coercive' show of authority requiring compliance with the officer's request." *Id.* at 403. Moreover, "[v]erbal inquiries can amount to a restriction on a person's liberty if they convey to a reasonable person that he or she is the subject of a criminal investigation along with other circumstances that indicate a show of authority." *State v. Acuna*, 264 Or App 158, 165, 331 P3d 1040, *rev den*, 356 Or 400 (2014).

Defendant argues that she reasonably believed that her liberty was restrained because Klopfenstein obtained defendant's identity, investigated her for outstanding warrants, questioned her about Shaw's identity, and indicated that there would be trouble for her "through her PO" if she was untruthful. She claims that those circumstances, combined with Klopfenstein's act of calling her parole officer out of her earshot and then immediately asking for consent to search, would have caused a reasonable person to conclude that she was not free to terminate the encounter.

We conclude that, under the totality of the circumstances, defendant was not seized until after she consented to the search. To begin, Klopfenstein made no physical

show of authority. The environment of the traffic stop was fluid but Klopfenstein's demeanor was nonconfrontational. Klopfenstein did not order defendant out of the minivan, nor did he make any other demands of defendant or any other show of force. His verbal inquiries were all in furtherance of his investigation of Shaw, not defendant. Even his admonishment to defendant that—if she was untruthful about Shaw's identity there could be trouble "through her PO"—was related to his investigation of Shaw. Further, Klopfenstein's call to Cortes does not assist defendant's argument that she was seized. As we noted in our discussion of defendant's coercion argument, we must presume that Klopfenstein never communicated to defendant that he was going to contact her parole officer or that he had done so before he asked for her consent to search.

Instead, at the time that Klopfenstein asked for consent to search, all that he had done was ask defendant questions, request information, and seek her cooperation with respect to Klopfenstein's investigation of Shaw's identity. None of those actions would have communicated to a reasonable person that they were the subject of a criminal investigation, and nothing in those actions and the surrounding circumstances was enough to constitute a show of authority "that gives rise to a seizure in a constitutional sense." *Backstrand*, 354 Or at 401.

Affirmed.