Submitted May 30, affirmed August 8, 2012

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

DARREL EDWARD MOATS,
*Defendant-Appellant.*

Lane County Circuit Court
200924661B; A145982

284 P3d 568

Peter Gartlan, Chief Defender, and Ernest G. Lannet, Chief Deputy Defender, Office of Public Defense Services, filed the brief for appellant.

John R. Kroger, Attorney General, Anna M. Joyce, Solicitor General, and Karla H. Ferrall, Assistant Attorney General, filed the brief for respondent.

Before Ortega, Presiding Judge, and Brewer, Judge, and Sercombe, Judge.

BREWER, J.

**BREWER, J.**

Defendant appeals from convictions for drug-related offenses based on evidence that officers discovered when they searched the parked vehicle that defendant had been driving after having questioned defendant and another person present in the vehicle. Defendant argues that the police officers' questioning that led to the discovery of that evidence was the result of an illegal stop and, for that reason, the trial court erred in denying his motion to suppress. We are therefore called on to determine when the interaction between the arresting officers and defendant became a constitutionally significant seizure and whether, at that point, the police officer had reasonable suspicion of criminal activity. We affirm.

We state the facts consistently with the trial court's findings of historical fact, which are supported by evidence in the record. *State v. Hall*, 339 Or 7, 10, 115 P3d 908 (2005). On the evening of September 2, 2009, at approximately 8:00 p.m., members of the Vice and Narcotics Unit of the Eugene Police Department were looking for signs of drug activity in the parking lot at a small shopping center that they knew to have a significant level of drug trafficking. It was dark outside, but there were low-light parking lights throughout the lot. The property owner had previously filed a "no trespassing letter" with the city, which gave the police permission to tell people loitering in the lot that they would be arrested for trespassing if they were not patronizing the area businesses. Officers staking out the lot generally would approach people loitering in the lot to inform them of the no trespassing letter. They would then fill out a field interview card to record the person's name, address, phone number, and vehicle description, and tell them that "in the future if they are there not conducting any legal business remaining on the property then they could face trespassing charges."

Officers Newell and Lowe and two other officers were staking out the parking lot in unmarked cars, wearing plain clothes. Newell noticed a car driven by a woman arrive in the lot and park near a closed coffee kiosk. The woman who had been driving, Bennett, did not get out of her car but sat there observing the parking lot entrances for approximately five minutes, until defendant drove his taxi into the lot

and parked next to Bennett's vehicle. Bennett then left her car, looked around, and got into the front passenger seat of defendant's vehicle. Defendant and Bennett greeted each other with a hug, and Bennett kissed defendant on the cheek. The two then appeared to be handling or exchanging items between them. Although Newell could not see the items, he saw arm and shoulder movements that indicated an exchange. Newell then suggested to Lowe that they "make contact" with the occupants of defendant's cab. The two officers approached defendant's vehicle on foot. Newell knocked on the passenger side window to talk to Bennett, while Lowe knocked on the driver's side window to talk to defendant. Both men identified themselves as police officers and showed their badges.

Newell explained to Bennett—in a calm and casual tone—that their conduct seemed suspicious, and he told her that using the lot without patronizing one of the nearby businesses was trespassing. Newell noticed that the knuckles on Bennett's hand were white and splotchy, as if she was clenching something in her fist. He asked Bennett if she had any drugs, which she denied, and then asked her what she had in her hand. Bennett was startled, and dropped four items, pretending that she had had nothing in her hand. Newell recognized the items as bindles of drugs and asked Bennett to step out of the cab. When he saw what had happened between Newell and Bennett, Lowe asked defendant to get out of the cab as well. Both defendant and Bennett then made incriminating statements. In addition, later examination revealed that the bindles did, indeed, contain drugs.

Based on several findings and conclusions that it made, the trial court denied defendant's motion to suppress that incriminating evidence. First, the court concluded that a stop had occurred, at the latest, when Newell saw the bindles that Bennett dropped. Second, the court concluded that, regardless of when the stop occurred, the officers had reasonable suspicion concerning Bennett's conduct when she entered defendant's cab. According to the court, that suspicion was based on the totality of circumstances, including the reputation of the parking lot for drug activity, the fact that Bennett had parked and waited several minutes

before getting into the front seat of defendant's cab, and the ensuing furtive movements inside the cab that indicated an exchange.

After addressing the issue of reasonable suspicion, the court found that the officers conducted themselves in a "civil nonconfrontational [and non]coercive manner." "There was no indication that they were coercive or * * * used some expression of excessive authority to prevent * * * or limit the liberties of the * * * [d]efendant and the passenger." The court noted that, in recent years, Oregon's appellate courts "have expressed a different appreciation for the appropriateness of casual conduct, even as identified as detectives or police officers, such that simply the identification of themselves as law enforcement does not rise to the level of a seizure or a stop." In making those findings, the court appeared to return to the question of whether the officers' conduct had effected a stop before Newell observed the bindles. After the trial court denied his motion to suppress, defendant waived his right to a jury trial and proceeded by a stipulated facts trial to the court. The court found defendant guilty as charged. On appeal, defendant assigns error to the court's denial of his motion to suppress.

We review a trial court's ruling on a motion to suppress for errors of law, deferring to the trial court's explicit and implicit factual findings. *State v. Ehly*, 317 Or 66, 75, 854 P2d 421 (1993). We first determine when the interaction between the arresting officers and defendant became a constitutionally significant seizure. A seizure of a person occurs under Article I, section 9, of the Oregon Constitution if (a) a law enforcement officer intentionally and significantly restricts, interferes with, or otherwise deprives an individual of that individual's liberty or freedom of movement; or if (b) a reasonable person under the totality of the circumstances would believe that (a) above has occurred. *State v. Ashbaugh*, 349 Or 297, 316, 244 P3d 360 (2010). Under that test, the lodestar for determining whether an officer has seized a defendant is whether the officer restricted the defendant's liberty or freedom of movement by a show of authority, *State v. Rodgers/Kirkeby*, 347 Or 610, 621-22, 227 P3d 695 (2010), which may be established through, among other circumstances, the content of the

officer's questions to the defendant or the officer's manner or actions during the encounter. *State v. Levias*, 242 Or App 264, 266-67, 255 P3d 611 (2011). Moreover, a reasonable person would believe that an officer's actions amounted to such a show of authority "if the person knew that he or she was the subject of a criminal investigation." *State v. Radtke*, 242 Or App 234, 239, 255 P3d 543 (2011).

In *Ashbaugh*, two police officers approached the defendant and her husband in a public park, took their identifications, and ran a warrant check on both of them. The warrant check revealed an active restraining order between the defendant and her husband, which led the officers to arrest the husband for violating the order. Then, after returning the defendant's identification to her and leaving her alone for about five minutes to place her husband in a police car, the officers returned to the defendant's location and, eventually, asked her for consent to search her purse. The defendant consented, and an officer discovered methamphetamine in the purse.

In determining whether the defendant had been seized before the search of her purse occurred, the Supreme Court reasoned that

> "the officers had returned defendant's identification to her and left her alone while completing the arrest and transportation of her husband. Thus, while it may have been true that defendant had been unlawfully detained by police some minutes before and had watched a clear show of authority directed at her husband, those circumstances had ended."

*Ashbaugh*, 349 Or at 317. Therefore, based on the totality of the circumstances at the time that the officers asked the defendant for consent to search her purse, the court concluded that a reasonable person would not have believed that his or her liberty or freedom of movement had been intentionally and significantly restricted and, accordingly, that the defendant had not been seized. *Id.* at 317-18.

Defendant here contends that

> "[a]ny reasonable person in [defendant's circumstances] would believe that he was not free to ignore the officers'

directions or exercise his freedom of movement by simply driving away. Rather, the detectives' choreographed approach and intentional 'contact' had the very effect that the detectives intended. Both detectives testified that they had no intention of allowing Bennett or defendant to leave without satisfying their drug-activity and trespassing concerns. Every action of the officers—approaching a relatively isolated vehicle, interrupting a couple who had just met, taking positions that blocked both of the taxi's exits, rapping the window, flashing badges, and making thinly-veiled accusations of deleterious behavior—constituted a show of authority over defendant. That show of authority forcefully conveyed to defendant that he was under the scrutiny of law enforcement officers who wanted him and his companion to justify their behavior. Simply put, the detectives' actions constituted a seizure under either subsection (a) or subsection (b) of the [*Ashbaugh*] test."

Unsurprisingly, the state takes a very different view of the evidence:

"But what occurred was not a stop, instead, it was mere conversation. The officers did not order defendant or Bennett to do anything and did not raise their voices or act in a coercive manner. Their actions, even in combination, did not constitute a restraint on defendant's liberty."

Because the officers here had (at least) reasonable suspicion to detain defendant when Bennett dropped the bindles of drugs, in deciding whether defendant was unlawfully seized, we focus on the period of time before that occurred. That inquiry takes us on another partially charted voyage into a sea of factual cross-currents in the wake of *Ashbaugh*. The confluence of several facts suggest that, in the totality of circumstances, there was no constitutionally significant seizure of defendant before Newell saw Bennett drop the bindles of drugs. Among those facts are the following: (1) the officers engaged defendant and Bennett in a calm, casual, and conversational tone and manner; (2) the officers used no physical force and made no threats; (3) there were no flashing lights or drawn weapons; (4) the officers did not ask for or retain the identifications of the vehicle's occupants; and (5) the officers did not direct the occupants to leave the vehicle or otherwise dictate or restrict their

physical activities. On the other hand, defendant points to other facts that, he asserts, show that he and Bennett were not free to leave: (1) the two officers approached both occupants in concert and knocked on their respective windows; (2) the officers then displayed their badges; and (3) the officers suggested that the occupants had engaged in suspicious behavior.[1] We now consider the effect of those facts in the totality of circumstances.

In *Ashbaugh*, the court was particularly struck by the fact that the arresting deputy "did not, for example, position himself and his fellow officer in a way that would suggest to defendant that [he] was surrounded," and, thus, the mere presence of a second officer was not a sufficient basis for us to conclude that the deputy's "manner or action" involved a "show of authority." 349 Or at 317. Since that decision, in determining whether a constitutionally significant seizure occurred, we have considered whether any additional officers made a show of authority toward the defendant. *See, e.g., State v. Smith*, 247 Or App 624, 629, 270 P3d 382 (2012) ("[T]here was a second officer present, but that second officer was standing alongside the driver's side of the car—defendant was on the passenger side—and thus the officers had not positioned themselves in a way to suggest that defendant was surrounded."). In this case, it is true that the two officers made a concerted approach to both occupants of the vehicle. However, there was no evidence that they physically blocked defendant's means of egress or that the second officer, Newell, had any interaction with defendant at all. *Smith*, 247 Or App at 629 (noting that second officer who was talking to another occupant of vehicle had no interaction with the defendant). Accordingly, the officers' concerted approach to the vehicle and ensuing

---

[1] The officers acknowledged that they did not intend to permit the occupants of the vehicle to leave without determining whether they were engaged in a drug transaction. However, there was no evidence that they communicated those intentions to the occupants or, as explained below, that they acted upon them so as to significantly restrict defendant's liberty or freedom of movement. Accordingly, the officers' subjective intentions are not dispositive in determining when a stop occurred. *State v. Smith*, 236 Or App 5, 14-15, 237 P3d 853, *opinion withdrawn and superseded on recons*, 247 Or App 624, 270 P3d 382 (2012) ("[A]n officer's unexpressed reasons for approaching and questioning someone are simply not relevant when the question is whether a reasonable person in the defendant's position could have believed that an officer had significantly restricted his or her liberty or freedom of movement.").

separate interaction with its occupants did not effect a seizure of defendant.

Moreover, questions from a police officer to a citizen—even questions an ordinary citizen would regard as offensive—do not, by themselves constitute a sufficient show of authority to effect a seizure. *Ashbaugh*, 349 Or at 317. Finally, the officers identified themselves and showed their badges to the occupants of the vehicle for the introductory purpose of explaining the officers' approach to the vehicle and their reason for contacting the occupants. Under *Ashbaugh*, those actions did not constitute a sufficient show of authority to convey the impression to a reasonable person that he or she was not free to leave.

Taken together, we conclude that the concerted interaction of the two officers and the nature of their engagement with the vehicle's occupants did not constitute a sufficient show of authority to countervail all of the other facts that we have identified that suggest that no unlawful seizure occurred before Bennett dropped the bindles of drugs. It follows that, up to that point, (a) the officers did not significantly restrict, interfere with, or otherwise deprive defendant of his liberty or freedom of movement, and (b) in terms of the pertinent legal rubric, a reasonable person under the totality of the circumstances would not believe that (a) above had occurred. Because the police had not seized defendant before they had reasonable suspicion to believe that he and Bennett had committed a crime, the trial court did not err in denying defendant's motion to suppress.

Affirmed.