AOYAGI, J.
*774 Defendant appeals a conviction for one count of unlawful possession of methamphetamine, ORS 475.894, assigning error to the trial court's denial of her motion to suppress. Defendant asserts that evidence found during an officer's search of her car was the product of an unlawful stop. The state contends that defendant was not stopped. The state implicitly concedes that, if she was stopped, the stop was unlawful and suppression was required. We conclude that defendant was stopped and, accordingly, reverse and remand.
We review the denial of a motion to suppress for errors of law. State v. Davis , 286 Or. App. 528, 529, 400 P.3d 994 (2017). We are bound by the trial court's express and implicit factual findings so long as they are supported by the record. Id. We state the facts in accordance with our standard of review, noting that, in this case, the evidence *223 was uncontested and consisted solely of the testimony of two law enforcement officers.[1]
On an April evening, Deputy Samerdyke drove past a bar in Dayton while on patrol. He noticed defendant's car outside the bar. Defendant was in the driver's seat, and two men were in the car. Another man, whom Samerdyke recognized as a drug dealer named Marsh, was standing near the back passenger door. As Samerdyke passed, defendant's head was down and she was holding her hand up as if trying to block her face from his view. When Marsh spotted Samerdyke, Marsh walked away from defendant's car and into the bar.
Defendant's car pulled out of the bar parking lot onto the street in the direction opposite of that which Samerdyke was travelling. Samerdyke turned around his patrol car and "got in behind [defendant's] vehicle." According to Samerdyke, it was "absolutely" possible for defendant to see him turn around to follow her. Because of Marsh's contact with the vehicle, Samerdyke suspected that there would be *775 drugs in the car. He followed defendant in the hopes that she would commit a traffic infraction so that he could stop her and conduct a drug investigation. Samerdyke was only "a few car lengths" behind defendant's car, and, as they drove, defendant's back seat passenger "kept turning around, looking at [Samerdyke], at the patrol car."
Samerdyke followed defendant's car on a road heading out of town for approximately 10 to 15 minutes, during which time defendant did not commit any traffic infractions. Eventually, defendant turned left onto a gravel road, at which point Samerdyke "lost them for a few seconds, minutes," as he passed by, turned around, and parked at the intersection to wait. After about five minutes, defendant's car came into view, driving back toward the main road. Upon coming into view of Samerdyke's patrol car, defendant turned suddenly onto a side road and disappeared. Samerdyke drove down the gravel road and tried to find the car. A jogger flagged him down and told him that it had driven onto the property of a commercial nursery.
When Samerdyke reached the nursery, he saw a long driveway (at least 100 yards) leading to a large parking lot and a very large building. The nursery was closed, and there were no people or vehicles in the area. A loop led from the parking lot around the back of the building. Samerdyke parked and called for backup because they were "kind of in a rural area and there were multiple people in the car." When Sergeant Rice arrived three minutes later, Samerdyke explained the situation, including that the vehicle's occupants were "trying to, I guess, hide back there out of sight."
Samerdyke and Rice drove their marked patrol cars around and behind the nursery building. They did not activate their lights, but they approached from opposite directions, with Samerdyke coming around the west side of the building and Rice coming around the east side. Behind the building, they found defendant and one passenger standing near the front of defendant's car; there was no sign of the second passenger. They parked their patrol cars to the side, such that they "weren't blocking anybody in," and got out and approached defendant and her passenger.
*776 Samerdyke immediately asked defendant whether they had permission to be on the property. Defendant responded that they did not but that she was having car issues. Samerdyke observed that the car's front bumper was partially hanging down in a way that he had not noticed when he first saw the car in Dayton. Rice also saw that the bumper was "definitely broken." Neither officer knew whether the vehicle was operable; Samerdyke thought it probably was but was not sure, while Rice thought that "it looked like more than likely they wouldn't drive it." Samerdyke asked defendant and her passenger who and where the second passenger was. They both denied knowing what he was talking about. Samerdyke then asked who the person was whom he had seen leaving defendant's car at the bar. Defendant responded that it was Marsh. Asked why *224 Marsh had left the car, defendant said that "once he saw [Samerdyke's] patrol car he told them to leave." Around then, Rice asked the passenger to come speak with him. Rice separated defendant and her passenger "as a safety precaution and [to] see what was going on."
Now alone, Samerdyke asked defendant if there was anything illegal in the car. She replied that she had just purchased the car and did not know. Recognizing defendant from a prior incident and knowing her to be a past heroin user, Samerdyke asked how she was doing in regard to drug use. Defendant told him that she had been clean for quite some time. Samerdyke asked again whether there was anything illegal in the car. Defendant said that "she didn't want to lie, she had a small amount of marijuana in the car." At that time, it was illegal to possess any amount of recreational marijuana under Oregon law. Defendant said that the marijuana was "in a small tin container kind of underneath the steering wheel." Samerdyke asked if he could retrieve the marijuana. Defendant said that was fine, put her hands in the air, and said, "[Y]ou can check whatever, Samerdyke, there's nothing in the car." Samerdyke proceeded to search defendant's car. He found the tin of marijuana in the location described by defendant. He also found a marijuana pipe in the glove box, and a pipe and a small bag of methamphetamine concealed inside containers in a black bag under a coat on the back floorboard.
*777 The state charged defendant with one count of possession of methamphetamine, ORS 475.894. Before trial, defendant moved to suppress the methamphetamine evidence, arguing that it was the product of an unlawful stop. The court denied the motion, and defendant was subsequently convicted. She appeals, assigning error to the denial of her motion to suppress.
The issue before us on appeal is singular. The state has never argued that Samerdyke had reasonable suspicion that defendant was engaged in criminal activity when he questioned her, nor does it argue attenuation or any other such matter. The only issue is whether defendant was "stopped" by the time that she consented to the search of her car. If so, the motion to suppress should have been granted; if not, it was properly denied.
Under Article I, section 9, of the Oregon Constitution, there are two types of nonarrest encounters between police and individuals: "mere conversations" and "stops." State v. Ashbaugh , 349 Or. 297, 308-09, 244 P.3d 360 (2010). The first type, "mere conversation," is a noncoercive encounter that does not implicate Article I, section 9, concerns. Id. at 308, 244 P.3d 360. The second type, a "stop," is a temporary restraint of liberty that, although a seizure, can be justified by reasonable suspicion of criminal activity. Id. at 308-09, 244 P.3d 360. What distinguishes mere conversation from a seizure "is the imposition, either by physical force or through some 'show of authority,' of some restraint on the individual's liberty." Id . at 309, 244 P.3d 360 (citation omitted).
Our courts have long recognized that law enforcement officers are "free to approach persons on the street or in public places, seek their cooperation or assistance, request or impart information, or question them without being called upon to articulate a certain level of suspicion in justification if a particular encounter proves fruitful." State v. Holmes , 311 Or. 400, 410, 813 P.2d 28 (1991), abrogated in part on other grounds by Ashbaugh , 349 Or. 297, 244 P.3d 360. "That is true even though the person approached may be discomforted by an officer's inherent authority as such and, for reasons personal to the individual, feel inclined or obliged to cooperate with the officer's request."
*778 State v. Anderson , 354 Or. 440, 450, 313 P.3d 1113 (2013). For an encounter to become a seizure, "the officer must add to those inherent pressures by either physically restraining the citizen's liberty in a significant way or engaging in a 'show of authority' that, explicitly or implicitly, reasonably conveys to the person a significant restriction on the person's freedom to terminate the encounter or otherwise go about his or her ordinary affairs." Id.
The test for a "stop" is an objective one. A person is seized under Article I, section 9, of the Oregon Constitution"(a) if a law enforcement officer intentionally and significantly restricts, interferes with, or otherwise *225 deprives an individual of that individual's liberty or freedom of movement; or (b) if a reasonable person under the totality of the circumstances would believe that (a) above has occurred." Ashbaugh , 349 Or. at 316, 244 P.3d 360 (internal quotation marks omitted). Because the latter part of the test depends on the totality of the circumstances, "the inquiry is not whether each of the officer's actions * * *, examined separately, would convey to a reasonable person" that she was not free to terminate the encounter or otherwise go about her ordinary affairs. State v. Charles , 263 Or. App. 578, 584-85, 331 P.3d 1012 (2014). "Rather, the question is whether all of the officer's actions combine to form a whole greater than the sum of its parts; that is, whether, based on the totality of the circumstances, a reasonable person would believe that the officer had intentionally and significantly deprived defendant of his freedom of movement." Id . at 585, 331 P.3d 1012. The "circumstances as a whole"-including "the content of the officers' requests, the manner in which they were made, or the overall context of the contact"-may elevate an encounter to the level of a seizure by conveying to the citizen that the officer would not allow her to leave. Anderson , 354 Or. at 453, 313 P.3d 1113.
Stated another way, what would be mere conversation becomes a seizure "only if the officer engages in conduct significantly beyond that accepted in ordinary social intercourse." Holmes , 311 Or. at 410, 813 P.2d 28. "The pivotal factor is whether the officer, even if making inquiries [that] a private citizen would not,[2 ] has otherwise conducted himself in a *779 manner that would be perceived as nonoffensive contact if it had occurred between two ordinary citizens." Id.
The "line between a 'mere encounter' and something that rises to the level of a 'seizure' does not lend itself to easy demarcation." State v. Backstrand , 354 Or. 392, 399, 313 P.3d 1084 (2013). Nonetheless, we must draw it, and, in this case, given the totality of the circumstances, we conclude that a reasonable person in defendant's position would believe that she was not free to terminate the encounter. As in Charles , "were we to look at each piece of the encounter between defendant and the officer independently, we would not necessarily conclude that any one piece, standing alone, amounted to a stop." 263 Or. App. at 584, 331 P.3d 1012. Indeed, we agree with the state that, viewing the interaction behind the nursery building in isolation, the officers' conduct would not constitute a stop. In other words, had the officers been driving past the nursery for another reason, noticed defendant standing next to her parked car, and stopped to talk to her, the situation would be different. Likewise, it would be different if someone had reported seeing a vehicle parked behind the closed nursery, and the officers had arrived, seen defendant, and stopped to question her.
But we disagree with the state that we may limit our consideration only to what happened after the officers arrived behind the nursery building. We must consider the "totality of the circumstances" to determine if a seizure occurred. Backstrand , 354 Or. at 399, 313 P.3d 1084. The "overall context of the contact" may convey to a citizen that she is not free to leave, even if the content or manner of the officer's questions alone does not. Anderson , 354 Or. at 453, 313 P.3d 1113. Thus, the pertinent question is not whether the officers' conduct behind the *780 nursery building constituted a stop, which is the focus of the state's arguments. The pertinent question is whether, even though the officers' conduct behind the nursery building would not constitute a stop in isolation, it rises to *226 the level of a stop when the circumstances leading up to that interaction are also taken into account. "In [some] cases, the circumstances accompanying verbal questions or requests have led this court to conclude that the defendant was seized, not by an officer's questions per se , but given the context in which they were asked and the totality of the circumstances otherwise involved." Backstrand , 354 Or. at 406, 313 P.3d 1084 ; see also State v. Highley , 354 Or. 459, 473, 313 P.3d 1068 (2013) (even if none of an officer's individual actions amount to a stop, the actions "in combination" may transform "what began as a mere encounter into a stop").
In this case, approximately 20 to 25 minutes passed from the time that Samerdyke first saw defendant at the bar to the time that he and Rice arrived behind the nursery building. During that period, Samerdyke reversed direction in an obvious manner to follow defendant, followed her at a close distance for approximately 10 to 15 minutes until she was in a remote area, lost her briefly when she turned onto a gravel road, came back and waited for her for five minutes at the intersection of the gravel road, saw her returning toward the main road but then turn suddenly onto another side road as soon as she came into view of his patrol car, and eventually tracked her down behind a deserted private building in a rural area where he perceived her to be "trying to * * * hide" from him. Two officers then converged on defendant in separate patrol cars from both sides of the building.
It is in that context that we view Samerdyke's questioning of defendant. After exiting his vehicle, the first question Samerdyke asked defendant was whether she had permission to be on the property. When she said that she did not but that she was having car issues, he did not ask whether she needed assistance with her obviously damaged car. Instead, he began questioning her about her absent second passenger and about a drug dealer whom he had seen standing near her car at least 20 minutes earlier, thus *781 eliminating any possible doubt that he had been following her and watching her since the bar. Rice then separated defendant and her passenger, leaving defendant alone with Samerdyke, who asked her whether there was anything illegal in her car. When she denied knowledge of what was in the car, he asked about her past drug use and "how she was doing with [her] drug use." When she denied current drug use, he asked her again if there was anything illegal in the car. Only then did she admit to having a small quantity of marijuana, at which point Samerdyke asked to retrieve it, and she said that was fine, put her hands in the air, and said," [Y]ou can check whatever, Samerdyke, there's nothing in the car."
Given the totality of the circumstances, a reasonable person in defendant's position would believe that she was not free to leave. A reasonable person in defendant's position would understand that Samerdyke was intent on questioning her and, having pursued her conspicuously for an extended time and tracked her down to the back side of a deserted building in a rural area with a second officer, would not allow her to leave until he did so. As defense counsel described it at the suppression hearing, Samerdyke's conduct as a whole communicated to defendant that she "could not get away" from him. Indeed, Samerdyke himself testified that, under the circumstances, he could understand defendant not feeling free to leave until he said something or gave her a citation.
In arguing for affirmance of the trial court's denial of defendant's motion to suppress, the state relies on State v. Moats , 251 Or. App. 568, 284 P.3d 568 (2012). In that case, the defendant and a passenger were sitting in a parked car in a shopping center parking lot. Id. at 570, 284 P.3d 568. Two plain-clothed officers in an unmarked car parked nearby observed them and suspected a drug exchange. Id. at 569, 284 P.3d 568. The officers exited their car and approached the parked car on either side. One officer knocked on the driver's window, and the other knocked on the passenger's window. They identified themselves as police officers and showed their badges. The passenger-side officer explained to the passenger in a "calm and casual tone" that their *782 conduct "seemed suspicious" and that using the lot without patronizing one of the nearby businesses was trespassing. Noticing that the *227 passenger appeared to be clutching something in her fist, he asked if she had any drugs, which she denied, and then asked what was in her hand. Startled, the passenger dropped four items, which the officer recognized as drug bindles. Id. at 570, 284 P.3d 568. On appeal, we held that, up until that point-when the officers developed reasonable suspicion of criminal activity to justify further action-a reasonable person in the passenger's position would have felt free to leave. Id . at 575, 284 P.3d 568. Put another way, any pressure that the passenger felt to cooperate was general social pressure related to the officer's inherent authority, not the result of physical restraint or a show of authority by the officer that explicitly or implicitly conveyed a significant restriction on her freedom to terminate the encounter and go about her ordinary affairs. See Anderson , 354 Or. at 450, 313 P.3d 1113.
By contrast, in State v. Acuna , 264 Or. App. 158, 331 P.3d 1040, rev. den. , 356 Or. 400, 339 P.3d 440 (2014), on which defendant relies, a uniformed officer responded to a report of four young adult males smoking marijuana. He parked his marked patrol car, approached the men on foot, and asked if they had been using marijuana. The individuals, including the defendant, denied possessing marijuana. Noting an odor of marijuana, the officer asked again, and they denied it again. The officer then radioed for backup. He advised the men that he " 'appreciate[d] honesty and cooperation from them' and that 'simple possession of less than an ounce of marijuana * * * is simply a ticket or violation.' " Id. at 160, 331 P.3d 1040. When the second officer arrived, she was more aggressive in her questioning. The first officer then asked for consent to a pat-down search. Id. at 161, 331 P.3d 1040. On appeal, we held that the encounter had escalated to a stop by that time. Id . at 166-67, 331 P.3d 1040. Given the totality of the circumstances-particularly the officer asking about drug possession again after the defendant denied it, the officer calling for backup, the second officer being "more aggressive" in her questioning, and the first officer then asking the defendant to consent to a patdown-a reasonable person would have perceived that he could not terminate the encounter. Id .
*783 Moats is one of the "large category of cases in which police officers approach and question persons sitting in parked cars without triggering constitutional protections against unreasonable seizures." Anderson , 354 Or. at 454, 313 P.3d 1113 ; see also, e.g. , State v. Dierks , 264 Or. App. 443, 445, 452, 332 P.3d 348 (2014) (no stop where a police officer on patrol saw a parked car, pulled over, and questioned the occupants). Acuna is an example of a similar situation but with the opposite result. This case has some factual similarities to both cases. As in Moats , the officers here did not draw weapons, speak in an aggressive tone, use physical force, or direct defendant's movements. See Moats , 251 Or. App. at 573, 284 P.3d 568. As in Acuna , however, the first officer called for backup to assist with the encounter, asked defendant questions about drug use and illegal items repeatedly despite her denials, and requested consent for a search.
Ultimately, the circumstances leading up to the questioning of defendant in this case-which are markedly different from those in cases such as Moats , Acuna , and Dierks -lead to the result. This was not a "brief and limited" encounter between an officer and a citizen, Anderson , 354 Or. at 452, 313 P.3d 1113, nor was it a chance encounter in a public place where a citizen was voluntarily present for reasons unrelated to law enforcement activity. An officer conspicuously followed defendant for 20 to 25 minutes until she was in an isolated location behind a deserted building on private property in a remote area, trying to "hide" from him. He and a second officer then converged on her. That conduct is significantly beyond that accepted in ordinary social intercourse and would not be "nonoffensive contact if it had occurred between two ordinary citizens." Holmes , 311 Or. at 410, 813 P.2d 28. In that context, the officer's subsequent questions about various forms of illegal conduct-first hinting at trespassing, then asking about a drug dealer with whom defendant had been seen, then asking about "anything illegal" in the car, then asking about illegal drug use, then asking again about "anything illegal" in the car, then asking to search the car-cannot be characterized as mere conversation.
*228 See Backstrand , 354 Or. at 402, 313 P.3d 1084. As a whole, Samerdyke's actions constituted a show of authority that, "explicitly or implicitly, reasonably convey[ed] to [defendant] a significant restriction *784 on [her] freedom to terminate the encounter or otherwise go about *** her ordinary affairs." Anderson , 354 Or. at 450, 313 P.3d 1113.[3]
As previously discussed, the state does not dispute that, if defendant was stopped, the seizure of the methamphetamine evidence was unlawful and that evidence should have been suppressed. We have concluded that defendant was stopped. Accordingly, we reverse the trial court's order denying defendant's motion to suppress and remand for a new trial.
Reversed and remanded.

The trial court made a statement on the record to the effect that its findings consisted of everything that the officers had said in testimony at the suppression hearing.

When engaged in "mere conversation" with a citizen, an officer may be interested in matters that are not typical subjects of casual conversation and ask questions that might be considered surprising or rude in ordinary social discourse. However, "questions from a police officer to a citizen-even questions an ordinary citizen would regard as offensive-do not, by themselves, constitute a sufficient show of authority to effect a seizure." State v. Moats , 251 Or. App. 568, 575, 284 P.3d 568 (2012). Similarly, asking questions that suggest that a criminal investigation is underway does not, in and of itself, give rise to a seizure. The question is not whether the circumstances of an encounter would cause a citizen to reasonably believe that she is the subject of a criminal investigation; rather, it is whether they would cause the citizen to reasonably believe that she is not free to terminate the encounter or otherwise go about her ordinary affairs. State v. Backstrand , 354 Or. 392, 396 n. 4, 401, 313 P.3d 1084 (2013).

We note that the totality of circumstances also distinguish this case from a line of cases-not cited by the parties-in which an officer follows a vehicle for a short distance, the driver spontaneously pulls off the road and parks in plain sight, and the officer approaches to make a general inquiry. See, e.g. , State v. Jensen , 102 Or. App. 323, 325-26, 794 P.2d 448 (1990) (not a stop where officer followed defendant's vehicle for two blocks, defendant pulled over spontaneously and parked, and officer approached him); State v. Jackson , 91 Or. App. 425, 427-28, 755 P.2d 732, rev. den. , 306 Or. 661, 763 P.2d 152 (1988) (not a stop where officer followed defendant's vehicle for a few blocks, defendant turned into an apartment complex and parked, and officer approached him); State v. Spenst , 62 Or. App. 755, 757-59, 662 P.2d 5, rev. den. , 295 Or. 447, 668 P.2d 383 (1983) (not a stop where officer followed defendant's vehicle for about 1/2 mile at a distance of four car lengths, defendant pulled to the side of the road without signaling, and officer pulled beside him). Samerdyke understood that defendant was trying to hide from him, and the fact that she was ultimately unsuccessful does not avoid the encounter becoming a stop. In that regard, this case is more akin to State v. Penney , 87 Or. App. 357, 360, 742 P.2d 660 (1987), in which an officer in a patrol car chased the defendant, who was on foot, until he caught up to him and the defendant stopped running. The defendant "demonstrated that he had no desire to engage the police in conversation when he changed direction on first sighting [the] patrol car and attempted to elude the police," to which the officer responded by pursuing him. Id . at 360-61, 742 P.2d 660. In those circumstances, "a reasonable person would [not] have felt free to walk away" once the officer "caught up with him." Id . at 360, 742 P.2d 660. More recently, in State v. Leiby , 293 Or. App. 293, 294-95, 299, --- P.3d ---- (2018), we held that the defendant was stopped when an officer followed him conspicuously as he pulled off the road twice in an apparent effort to avoid the officer, and the officer then confronted him in a parking lot with the question, "Is there any reason or do you want to tell me why you're trying to avoid me?"