Argued and submitted December 19, 2018, reversed and remanded
September 2, 2020

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

KELLY DAVID ANKENY, JR.,
*Defendant-Appellant.*

Multnomah County Circuit Court
130431551, 15CR42153;
A164630 (Control), A164631

474 P3d 406

Defendant appeals the judgments revoking his probation in two cases. In both cases, defendant contends that the trial court erred by denying his motion to suppress evidence obtained during a traffic stop for improper display of a permit, ORS 803.655. Defendant argues that the officer's probable cause for the stop dissipated because the officer was able to read the permit in defendant's car when the officer, after stopping defendant's car, approached defendant's car on foot. *Held*: The trial court erred. Once the officer approached defendant's car and was able to read and inspect the permit, it was not objectively reasonable to believe that defendant was in violation of ORS 803.655, because the facts as the officer perceived them demonstrated that defendant was in compliance with OAR 735-032-0030(2).

Reversed and remanded.

Judith H. Matarazzo, Judge.

Erin J. Snyder Severe, Deputy Public Defender, argued the cause for appellant. Also on the briefs was Ernest G. Lannet, Chief Defender, Criminal Appellate Section, Office of Public Defense Services.

Christopher A. Perdue, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Armstrong, Presiding Judge, and Tookey, Judge, and Shorr, Judge.

TOOKEY, J.

Reversed and remanded.

**TOOKEY, J.**

In this consolidated appeal, defendant appeals the judgments revoking his probation in two cases, 15CR42153 and 130431551. In both cases, defendant contends that the trial court erred in denying his motion to suppress evidence obtained during a traffic stop for improper display of a permit, ORS 803.655. We conclude that the officer's probable cause in this case dissipated prior to the officer obtaining the evidence that defendant sought to suppress. Therefore, we conclude that the trial court erred in denying the motion to suppress. We reverse and remand.

"We review the denial of a motion to suppress for errors of law." *State v. Brown*, 293 Or App 772, 774, 427 P3d 221 (2018). "We are bound by the trial court's express and implicit factual findings so long as they are supported by the record." *Id.* We state the facts in accordance with our standard of review.

While on patrol, a police officer saw a car that had a temporary permit mounted in the left corner of the rear window. Due to the angle of the rear window, the permit could not be read by a car following behind it. The officer followed the car for approximately three-quarters of a mile in an attempt to read the temporary permit and during that time was unable to read the permit at all.

The officer then stopped the car for what the officer characterized as "improper display of the temp tag." After stopping the car, the officer approached the car on foot and while doing so was able to read the temporary permit that was in the rear window. The officer then walked to the car's window, told the driver—defendant in this case—why the officer had stopped him, and asked defendant for his driver's license. Defendant responded that he did not have a driver's license and that he was not supposed to be driving.[1]

Defendant's driver's license was, in fact, revoked, and because he was driving, the state alleged that defendant had violated his probation in two cases, 15CR42153

---

[1] We note that there was a second officer present during the traffic stop. The second officer did not testify in the trial court, however, and her presence at the traffic stop was not relevant to the trial court's analysis nor is it relevant to ours.

and 130431551. At a subsequent probation violation hearing for both cases, defendant moved to suppress evidence that was obtained as a result of the stop.

At the hearing, the state argued that the stop was lawful because the temporary permit defendant displayed was not "readable." Defendant argued that no probable cause existed for the stop because the temporary permit was "visible" and that, in any event, prior to even contacting the defendant—*i.e.*, when the officer approached defendant's car—it became clear to the officer that the permit was not "somehow invalid or expired."

The trial court denied defendant's motion to suppress, finding that the rear window of defendant's vehicle was "slanted" and that it was more likely than not the officer "couldn't see" the permit and stopped defendant for that violation. Because the uncontroverted evidence during the suppression hearing was that the officer could see the temporary permit that was in defendant's window but could not read it while he was following defendant's car, and given the arguments made to the trial court, we understand the trial court's finding that it was more likely than not that the officer "couldn't see" the permit to be a finding that the officer could not see what was written on the temporary permit during the time the officer was following defendant's vehicle and that that was due to the design of defendant's vehicle rather than the placement of the permit.

After denying the suppression motion, the trial court determined that defendant had violated the conditions of his probations and revoked his probations.

"Under Article I, section 9, of the Oregon Constitution, before a police officer may stop a citizen for a traffic violation, the officer must have probable cause to believe that a violation occurred." *State v. Husk*, 288 Or App 737, 739, 407 P3d 932 (2017), *rev den*, 362 Or 665 (2018). "An officer has probable cause when two conditions are met." *Id*. "First, the officer must subjectively believe that an offense occurred." *Id*. "Second, the officer's subjective belief must be objectively reasonable[.]" *Id*. "[I]n order to satisfy the objective component, the facts that the officer perceives to exist must establish the elements of *an* offense, even if not the

offense that the officer believed the defendant committed." *State v. Boatright*, 222 Or App 406, 410, 193 P3d 78, *rev den*, 345 Or 503 (2008) (emphasis in original). "Whether the facts establish probable cause to stop someone for a traffic violation is a question of law that we review for legal error." *Husk*, 288 Or App at 739.

In this case, defendant does not dispute that the officer who stopped him subjectively believed that defendant had an improperly displayed temporary permit. Thus, the issue on appeal is whether that belief was objectively reasonable.

As relevant to our analysis in this case, ORS 803.655(1) creates the offense of improper display of a permit. It provides:

"A person commits the offense of improper display of a permit if the person is issued a permit under ORS 803.600, 803.615 or 803.625, and the person does not display the permit on the vehicle in the manner required by ORS 803.650 or as required by the Department of Transportation by rule."

ORS 803.655(1). ORS 803.650 provides:

"(1)  A permit issued under ORS 803.600, 803.615 or 803.625 shall be placed on the left side of the rear window of the vehicle unless:

"(a)  The vehicle has no rear window; or

"(b)  The design of the vehicle or of any equipment lawfully added to the vehicle is such that a permit placed as required by this section could not easily be seen from outside the vehicle.

"(2)  The Department of Transportation shall adopt rules for the placement of permits that cannot be placed on the left side of the rear window of a vehicle."

Thus, under ORS 803.650(1), trip permits issued under ORS 803.600 and temporary permits issued under ORS 803.615 and ORS 803.625, must be placed on the left side of the rear window of a vehicle, unless one of two exceptions apply. Those two exceptions are when (1) a vehicle has no rear window or (2) a vehicle's design or any equipment lawfully added to the vehicle makes it so the

permit cannot "easily be seen from outside the vehicle." ORS 803.650(1)(a), (b).

Additionally, ORS 803.650(2) directs the Oregon Department of Transportation (ODOT) to adopt rules for the placement of permits that cannot be placed on the left side of the rear window of a vehicle.

ODOT has adopted OAR 735-032-0030, which provides, in relevant part:

"(1)   Temporary registration permits issued under ORS 803.625 must be readable from the outside of the vehicle and placed as follows:

"* * * * *

"(b)   Vehicle with a rear window: inside, on the left side and lower corner of the rear window.

"* * * * *

"(2)   If the permit cannot be placed as described in section (1) of this rule, it must accompany the vehicle and be available for inspection upon request by a law enforcement officer or any other person authorized to inspect vehicle registration. The permit may be kept on the vehicle operator's person or in a storage area on the vehicle."

Thus, OAR 735-032-0030(1) requires that, when a vehicle has a rear window, such as the vehicle defendant was driving, temporary registration permits issued under ORS 803.625 must be (1) "readable from the outside of the vehicle" and (2) placed "inside, on the left side and lower corner of the rear window." If a permit cannot be placed in such a way, then, under OAR 735-032-0030(2), the permit must "accompany the vehicle and be available for inspection upon request by a law enforcement officer or any other person authorized to inspect vehicle registration."

Turning to the parties' arguments on appeal, defendant argues that the officer lacked probable cause to stop him for a traffic violation. Defendant contends that, as used in ORS 803.650(1)(b), "easily be seen" means "visible," and, accordingly, "all ORS 803.650 requires is that the permit be visible from outside the vehicle." In defendant's view, the placement of the temporary permit in this case was in

accordance with ORS 803.650(1) because the permit was on the left side of the rear window and was visible from outside the vehicle.

Defendant further contends that OAR 735-032-0030 is inapplicable because, given his proffered construction of ORS 803.650(1)(b)—that "easily be seen" means "visible"—the statutory prerequisites for application of that rule under ORS 803.650 were not met and that, even if OAR 735-032-0030 is applicable, the officer's probable cause to stop defendant dissipated once the officer could read the permit from outside the vehicle.

The state, for its part, argues that both ORS 803.650 and OAR 735-032-0030 require that temporary permits be readable by officers following a vehicle, and defendant's temporary permit was not. In the state's view, the purpose of the temporary permit display requirement is to ensure that state agents tasked with ensuring compliance with the state's vehicle registration rules can read temporary permits from patrol cars. Accordingly, as the state views it, the officer perceived facts that satisfied the elements of a traffic violation, and the officer's probable cause did not dissipate even though, when the officer approached defendant's vehicle, the officer was able to read the temporary permit.

Given the arguments on appeal, the first step in our analysis is to determine whether, given the facts as the officer perceived them, defendant was required to comply with the display requirement in ORS 803.650(1) or whether an exception applied. To answer that question, we first consider whether the exception found in ORS 803.650(1)(b) applies when the design of a vehicle makes permits not "visible" from outside the vehicle, as defendant contends, or when it makes permits not "readable" from outside the vehicle, as the state contends.

The meaning of ORS 803.650(1)(b) is a question of statutory construction. In interpreting statutes, "we seek to determine the legislature's intention, by reviewing the statutory text and context, and, if the court concludes that it appears useful to the analysis, the legislative history." *TriMet v. Amalgamated Transit Union Local 757*, 362 Or

484, 493, 412 P3d 162 (2018). We begin with the text, as "there is no more persuasive evidence of the intent of the legislature." *State v. Gaines*, 346 Or 160, 171, 206 P3d 1042 (2009).

The legislature did not define "seen" in ORS 803.650(1)(b) and, therefore, we look to the dictionary for further guidance. *Pride Disposal Co. v. Valet Waste, LLC*, 298 Or App 751, 759, 448 P3d 680, *rev den*, 366 Or 64 (2019). However, "we do not simply consult dictionaries and interpret words in a vacuum." *State v. Cloutier*, 351 Or 68, 96, 261 P3d 1234 (2011). "Dictionaries do not tell us what words mean, only what words *can* mean, depending on their context and the particular manner in which they are used." *Id.* (emphasis in original).

The word "seen" means "perceived or verified by sight : VISIBLE." *Webster's Third New Int'l Dictionary* 2056 (unabridged ed 2002). Seen is also the past participle of the verb "see." See, in turn, may mean "to perceive by the eye : apprehend through sight." *Id.* at 2054. But "see" may also mean "to inspect or read understandingly (something written or printed)." *Id.* Those definitions establish that "easily be seen" might mean "easily be visible" or "easily be read understandingly." That is, given the text of ORS 803.650(1)(b), either party's interpretation of ORS 803.650(1)(b) might "be permitted, but neither is required." *Pride Disposal Co.*, 298 Or App at 760 (internal quotation marks and emphases omitted).

With those definitions in mind, we next consider statutory context, including related statutes. *Northwest Natural Gas Co. v. City of Gresham*, 359 Or 309, 322, 374 P3d 829 (2016). In this case, understanding the context in which the legislature used "easily be seen" in ORS 803.650 requires understanding how that statute operates within the statutory scheme for vehicle registration requirements in Oregon and understanding the purpose of vehicle registration requirements.

"[C]ar registration records were created by the state for its own purposes," including the "substantial administrative interest in confirming that only licensed persons drive properly registered vehicles on public roads." *State v. Davis*,

237 Or App 351, 356, 239 P3d 1002 (2010). "Registration" when used "in reference to vehicles," means "the recording of a vehicle as authorized for use within a jurisdiction and includes any documentation or devices issued as evidence of that authorization." ORS 801.410(1). "A person commits the offense of failure to register a vehicle if the person owns a vehicle in this state and the person does not register the vehicle in this state." ORS 803.300.

A "[r]egistration plate" is a plate "issued by a jurisdiction as evidence of vehicle registration." ORS 801.415. Subject to certain exceptions, pursuant to ORS 803.520, ODOT "shall issue and deliver to the owner registration plates" after "filing of application for registration and payment of the appropriate registration and registration plate fees."

In part to confirm that vehicles are properly registered, ORS 803.540 requires vehicles to display registration plates and to do so "in plain view and so as to be read easily by the public." ORS 803.540(1); *Davis*, 237 Or App at 356. Knowingly altering, modifying, covering, or obscuring a registration plate, "in any manner * * * so as to render them unreadable" is prohibited. ORS 803.550(2).

Under certain circumstances, however, it is not a traffic violation to operate a vehicle in the state without displaying a valid registration plate issued by the state— *viz.*, when the vehicle has a "trip permit" or a "temporary permit."

A "trip permit" grants "authority to temporarily operate a vehicle on the highways of this state under circumstances where the operation would not otherwise be legal because the vehicle is not registered by this state or because provisions relating to the vehicle's registration do not allow the operation." ORS 803.600. Under ORS 803.600(1), trip permits may be issued by ODOT. Additionally, under ORS 803.600(2), trip permits may be issued by a person issued a vehicle dealer certificate or a towing business certificate "to a person who buys a motor vehicle from the person with the certificate if the registration stickers are removed." A trip permit issued by a person issued a vehicle dealer certificate or a towing business certificate "allows operation of the

motor vehicle in this state for the purpose of registering the vehicle." ORS 803.600(2)(a).

In addition to trip permits, ODOT may issue a "temporary permit *** to an applicant for registration to permit the applicant to operate the vehicle while the department is determining all facts relative to the right of the applicant to receive *** regular registration plates and regular registration." ORS 803.615. The "holder of a current, valid vehicle dealer certificate" can also issue "temporary permits for the operation of vehicles *** pending the receipt of permanent registration from the department." ORS 803.625(1). Temporary permits issued by ODOT under ORS 803.615 are referred to as "temporary application permits" in some places in the motor vehicle code, *see, e.g.*, ORS 803.540(2)(a), while temporary permits issued by vehicle dealers under ORS 803.625 are referred to as "temporary registration permit[s]," *see, e.g.*, ORS 803.630(1).

A person issued a temporary permit under ORS 803.625 commits a traffic violation if they violate "any rule adopted by the Department of Transportation under ORS 803.625 concerning the use of the permit" or fail "to keep the permit on and upon the vehicle during the period until the receipt of the permanent registration plates." ORS 803.635.

The legislature has mandated that the "[t]he color and size of the print on permits issued under ORS 803.600, 803.615 and 803.625" is such that "the permits can easily be read." ORS 803.660.

From the statutory context surrounding ORS 803.650(1)'s display requirement for permits, it is evident that, like registration plates, permits provide evidence of authorization to drive on Oregon roads, and that is why, like registration plates, they are required to be displayed. Further, it is evident that the legislature intended that, when displayed, permits, like registration plates, would be readable. *See* ORS 803.660 (requiring trip and temporary permits be designed in such a manner that they "can easily be read"); ORS 803.540(1) (requiring registration plates to be displayed "in plain view and so as to be read easily by the public").

Given that context, we understand the primary purpose of the display requirement in ORS 803.650(1) to be to ensure that, when people are not displaying a valid registration plate as evidence of vehicle registration, state authorities charged with monitoring compliance with vehicle registration requirements have a means to readily and easily determine whether an exception to the normal vehicle registration requirement applies—*i.e.*, a means to determine whether a vehicle has a valid permit.

We next turn to the legislative history of ORS 803.650, mindful that, in general, "an examination of legislative history is most useful when it is able to uncover the manifest general legislative intent behind an enactment." *DCBS v. Muliro*, 359 Or 736, 753, 380 P3d 270 (2016).

Both ORS 803.650 and ORS 803.660 were enacted through House Bill (HB) 2775 (1987). As noted, ORS 803.650 requires that, unless one of two exceptions apply, permits be placed on the "left side of the rear window" and ORS 803.660 mandates that "[t]he color and size of the print" on such permits is such that "the permits can easily be read." ORS 803.660.

Prior to passage of HB 2775, the "accepted practice" was to place permits in the lower left corner of a vehicle's front window. Tape Recording, Senate Committee on Transportation, HB 2775, Apr 27, 1987, Tape 102, Side A (statement of Bill Seally). At the House Committee on Transportation public hearing and work session on HB 2775, Representative John Minnis briefed the committee on the bill. He explained the purpose for the bill as follows:

> "[T]he problem that a lot of police officers run into is that as you're following a car down the street *** you'll often times [find] a car that either has expired plates or does not have a visible vehicle plate at all. The police officer then has to either drive up alongside the vehicle or somehow peer through the window to see if there is a temporary tag in that window, making a determination or decision as to whether they want to stop that car and verify that in fact they do either have current plates or registration. So the justification was to move it to that back left window so that officers could see it."

Tape Recording, House Committee on Transportation, HB 2775, Mar 12, 1987, Tape 42, Side A (statement of Rep John Minnis). Representative Minnis further explained that the benefit of the display requirement for permits in HB 2775 is that it would allow "law enforcement agencies who are there to control the traffic and make sure that we all have appropriate registrations and permits to drive our cars" a means to ensure that people "in fact do have those permits." *Id*.

Additionally, in Representative Minnis' view, HB 2775 would reduce unnecessary traffic stops because it would enable officers to "see" a permit and to "verify" that it was a "good and valid registration" without pulling a vehicle over. *Id.*; *see also* Tape Recording, Senate Committee on Transportation, HB 2775, May 1, 1987, Tape 105, Side A (statement of Rep John Minnis) (explaining that HB 2775 "would help alleviate some of the problems with inappropriate stops by police officers or stops that maybe are unnecessary, and would prevent police officers from having to subsequently be embroiled in some dispute over justification or reason for stopping the car").

At that same meeting, Bill Seally, a representative from the Department of Motor Vehicles, testified that, in designing forms that "can easily be read" the Department of Motor Vehicles would consult with law enforcement about what is readable. Tape Recording, House Committee on Transportation, HB 2775, Mar 12, 1987, Tape 42, Side A (statement of Bill Seally).

At a subsequent meeting of the Senate Committee on Transportation, Seally explained that the "two key pieces of information" on a permit are "the expiration date and the vehicle identifier" and that those allow a law enforcement officer to determine whether the permit "was attached to the correct vehicle and determine whether it was still valid." Tape Recording, Senate Committee on Transportation, HB 2775, Apr 27, 1987, Tape 101, Side A (statement of Bill Seally). Seally further explained that the intent of the permit readability provision in HB 2775 was to "make the permit more visible," and to "make sure the important items on it *** would be readable from more distance than they are now." *Id.*

The legislative history of ORS 803.650 confirms our understanding that the primary purpose of the display requirement in ORS 803.650(1) is to ensure that, when people are not displaying a valid registration plate as evidence of vehicle registration, state authorities charged with monitoring compliance with vehicle registration requirements have a means to readily and easily determine whether an exception to the normal vehicle registration requirement applies—*i.e.*, the vehicle has a valid permit. It also reflects that, in particular, the bill was intended to give law enforcement officers on patrol a means of verifying that a vehicle has a valid permit without engaging in an unnecessary traffic stop.

With that understanding of the text, context, and legislative history of ORS 803.650, we turn back to when the exception in ORS 803.650(1)(b) to the permit placement requirement in ORS 803.650(1) applies. We conclude "easily be seen," as used in ORS 803.650(1)(b), means "easily be read understandingly." Therefore, the legislature intended that the exception in ORS 803.650(1)(b) to the display requirement in ORS 803.650(1) apply when the "design of the vehicle or of any equipment lawfully added to the vehicle" makes it so that a permit could not easily be read understandingly by a person driving behind the vehicle with the permit, such as the officer in this case.

Here, the design of defendant's vehicle—*i.e.*, the slanted rear window—made it so that defendant's temporary permit could not easily be read understandingly by a person in a vehicle following behind him, and, thus, the display requirement in ORS 803.650(1) was inapplicable. Defendant was, however, required to comply with OAR 735-032-0030.

As noted, OAR 735-032-0030(1) requires that, when a vehicle has a rear window, such as the vehicle defendant was driving, temporary registration permits issued under ORS 803.625 must be (1) "readable from the outside of the vehicle" and (2) placed on the "left side and lower corner of the rear window." If a permit cannot be placed in such a way, then, under OAR 735-032-0030(2), the permit must "accompany the vehicle and be available for inspection upon

request by a law enforcement officer or any other person authorized to inspect vehicle registration."

In construing an administrative rule, such as OAR 735-032-0030, "we apply the same analytical framework that applies to the construction of statutes." *State v. Hogevoll*, 348 Or 104, 109, 228 P3d 569 (2010). For vehicles like defendant's that have a rear window, the text of OAR 735-032-0030 expressly mandates that temporary permits issued under ORS 803.625 "must be readable from the outside of the vehicle," unless they "cannot be." OAR 735-032-0030, like ORS 803.650, concerns placement of temporary permits. As described above, temporary permits provide evidence of authorization to drive on Oregon roads, and temporary permits are required to be displayed so that state authorities charged with monitoring compliance with vehicle registration requirements have a means to readily and easily determine whether an exception to the normal vehicle registration requirement applies. The legislature has mandated that temporary permits be designed in such a way that they are "readable." Further, as discussed above, one purpose of display and readability requirements regarding permits was to reduce unnecessary traffic stops by officers on patrol.

With that understanding of the text and context OAR 735-032-0030, we conclude that "readable from the outside of the vehicle," as that phrase is used in OAR 735-032-0030(1), and with reference to a vehicle that has a rear window, means readable by someone in another vehicle following the vehicle with the temporary permit. That is the "normal position" from which a person, and particularly a law enforcement officer on patrol, would view a temporary permit. *See Boatright*, 222 Or App at 413-14 (officer had probable cause to investigate the defendant for illegal alteration or display of a registration plate, ORS 803.550, because, although the officer could see "the entire plate from an unusual position"—*i.e.*, "looking down at the license plate from directly above," he was unable to see the "the registration sticker [on the plate] from a normal position"—the "angle that it would most commonly be viewed").

That conclusion, however, does not end our inquiry regarding probable cause in this case. Under OAR

735-032-0030(2), when, among other things, a temporary permit is not "readable from the outside of the vehicle" the permit is required to "accompany the vehicle and be available for inspection upon request by a law enforcement officer or any other person authorized to inspect vehicle registration." Here, once the officer approached defendant's vehicle and was able to read and inspect the permit, it was not objectively reasonable to believe that defendant was in violation of OAR 735-032-0030, because defendant was in compliance with OAR 735-032-0030(2).

*State v. Farley*, 308 Or 91, 75 P2d 835 (1989), is instructive. In that case, a police officer stopped the defendant because the defendant's vehicle "had no visible license plates, an apparent traffic infraction. ORS 803.540." *Farley*, 308 Or at 93. When approaching the defendant's vehicle, however, the officer noticed a valid temporary vehicle permit posted on the window, allowing the vehicle to be operated without license plates under ORS 803.540(2)(a). *Farley*, 308 Or at 93. The officer's observation of the valid temporary permit satisfied the reason for the initial stop, and the officer observed no other wrongdoing. *Id.* Nonetheless, "as a matter of police routine, the officer asked defendant for his driver license." *Id.* The defendant presented his license and the officer then detained the defendant and his vehicle while checking on the status of his license. *Id.* On the basis of information obtained, the officer cited the defendant for driving while suspended. *Id.*

The defendant moved to suppress evidence obtained as a result of the stop, and the trial court granted the motion. *Id.* The Supreme Court affirmed the trial court's ruling, reasoning that, although "the officer lawfully stopped defendant for the purposes of investigation reasonably related to the apparent traffic infraction of operating a vehicle without license plates," upon seeing the temporary permit, "the justification of any investigation was vitiated. Plain and simple, the officer had no statutory authority to proceed further. That authority ended with the officer's discovery that the traffic infraction he was investigating had not actually occurred." *Id.* at 94 (internal quotation marks and brackets omitted).

In this case, the officer stopped defendant for improper display of a permit, but, once the officer was able to see that defendant had a valid temporary permit available for inspection, the "facts that the officer perceive[d]" no longer "established the elements of *an* offence." *Boatright*, 222 Or App at 410 (emphasis in original). That is because the facts as the officer perceived them when he approached on foot, by seeing and reading the permit, demonstrated that defendant was in compliance with OAR 735-032-0030(2) because the permit accompanied the vehicle and was available for inspection. Thus, the "justification of any investigation was vitiated." *Farley*, 308 Or at 94. At that point, the officer had no probable cause to proceed with the traffic stop and ask defendant for his driver's license and thereafter obtain the evidence that defendant sought to suppress.[2]

In light of our analysis above, we conclude that the trial court erred in denying defendant's motion to suppress. We therefore reverse and remand.

Reversed and remanded.

---

[2] "[A]n officer cannot simply ignore evidence that evinces a person's innocence when determining whether there is probable cause." *Miller v. Columbia County*, 282 Or App 348, 359, 385 P3d 1214 (2016), *rev den*, 361 Or 238 (2017). In this case, the facts as the officer perceived them when he approached defendant's vehicle demonstrated that, although defendant's temporary permit was not readable when the officer was driving behind defendant due to the angle of defendant's rear window, defendant had a temporary permit that was "available for inspection upon request by a law enforcement officer." OAR 735-032-0030(2). Accordingly, the officer's probable cause to stop defendant for improper display of a permit, ORS 803.655, dissipated before he asked defendant for his driver's license and obtained the evidence that defendant sought to suppress.